## A. W. STICKLE & CO. v. INTERSTATE COMMERCE COMMISSION.
### No. 2410.

Circuit Court of Appeals, Tenth Circuit.
May 1, 1942.
Rehearing Denied June 5, 1942.

156

Duke Duvall, of Oklahoma City, Okl. (J. B. Dudley and Dudley, Hyde, Duvall & Dudley, all of Oklahoma City, Okl., on the brief), for appellant.

Louis I. Dailey, of Little Rock, Ark., and Francis A. Silver, of Washington, D. C. (Cleon A. Summers, U. S. Atty., of Muskogee, Okl., and Geo. H. English, of Jefferson City, Mo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

The Interstate Commerce Commission brought this action against A. W. Stickle & Company to enjoin it from transporting or holding itself out to transport property for the general public in interstate commerce by motor vehicle for compensation and from transporting or holding itself out to transport property in interstate commerce by motor vehicle for compensation on public highways under individual contracts or agreements and not for the general public and from engaging in interstate commerce as a common carrier or a contract carrier by motor vehicle, unless and until it had complied with the requirements of Part II of the Interstate Commerce Act, 49 U.S.C.A. §§ 301–327, respecting common carriers and contract carriers. From a judgment granting the injunction as

prayed for, Stickle & Company has appealed.

The facts are these: Stickle & Company is a corporation, organized under the laws of Oklahoma, with its principal office and place of business in Oklahoma City. Prior to its incorporation on February 9, 1939, its principal stockholders, Robert O. Jackson and Arthur W. Stickle, were engaged in the sale of lumber as brokers on a commission basis. Their commissions approximated five per cent of their gross sales.

Stickle & Company is the owner and operator of ten motor vehicles, each vehicle comprising a tractor-trailer unit. Since January 1, 1940, it has used such motor vehicles to transport lumber on the public highways from various lumber mills located in Texas, Arkansas, and Louisiana to destinations in Oklahoma, Texas, Kansas, Missouri, and Illinois. Since January 1, 1940, it has thus transported monthly from 38 to 77 loads, aggregating from 450,000 to 850,000 board feet of lumber. A substantial portion of such transportation has passed through the Eastern District of Oklahoma. The drivers of such vehicles are employed by Stickle & Company and the vehicles are registered in the name of Stickle & Company in the state of Oklahoma.

Stickle & Company leases from a third party, lumber storage facilities in Oklahoma City. Approximately five per cent of the lumber handled is stored at such facilities. The maximum quantity of lumber stored in the yard rarely, if ever, exceeds 35,000 to 40,000 feet at a given time. Not infrequently the storage facilities are not used for periods of two weeks or longer.

Stickle & Company circulated quotations of its prices on various grades, sizes, and classes of lumber to numerous prospective purchasers. Until about the time of the trial below, such prices were quoted both on the basis of acceptance of the lumber by the purchaser at the mill, and on a delivered basis. It set up a schedule of payments to be added to the f. o. b. mill prices for delivery to the customer. The average load approximates 10,300 board feet. Payments to be added to the f. o. b. mill prices were originally listed on a schedule of "trucking rates," the rates varying as to points of delivery. Upon advice of counsel, and after an investigation was initiated by the Interstate Commerce Commission, Stickle & Company changed the designation of this schedule to "Schedule of Advance Payments" or "Advances to Driver."

On a steady, normal market, approximately 75 to 80 per cent of the lumber handled by Stickle & Company is purchased after receipt of orders therefor, but on an advancing or declining market, the percentage varies between 40 and 85 per cent, respectively.

Upon receipt of an order for lumber not already purchased from a mill by Stickle & Company, it sends circulars to one or more of the mills in Arkansas, Louisiana, or Texas, quoting prices it will pay for the various grades, sizes, and classes of lumber required to fill the order. After arranging for the purchase of the lumber required and on receipt of advice from the mill that it is ready for delivery, it dispatches one of its trucks to the mill for the purpose of loading the lumber and transporting it to the purchaser.

Between 70 and 90 per cent of the lumber handled is delivered by Stickle & Company trucks. The remainder is shipped by rail, by mill truck, or by motor carriers for hire.

Formerly, the driver of each truck was furnished by Stickle & Company with a document designated as a "freight bill." It set forth the location of the mill, the date, Stickle & Company's order number, its truck number, the name of the driver, the name and location of the consignee, a description of the lumber, and the amount of delivery charges to be paid to the driver by the consignee, such payment to be made in the form of a check payable to Stickle & Company. Upon advice of counsel, and after the institution of an investigation by the Interstate Commerce Commission, the name of the document was changed to "loading tally."

Upon delivery of the lumber to the purchaser, the latter was required to receipt for same by signing and delivering to the driver a copy of the freight bill or loading tally, and to deliver to the driver a check payable to Stickle & Company for the amount of the transportation charge shown on the freight bill or loading tally. The amount of charges thus collected has aggregated more than $3,000 monthly. In order to give the customer an opportunity to take a two per cent discount for prompt payment, Stickle & Company send an invoice to the customer showing the price of the lumber, on which the discount is allowable, separate and apart from the pay-

ment made by the purchaser as advances to the driver.

At or about the time of the trial below, Stickle & Company adopted a modified plan. It divided its trade territory into zones and quoted delivered prices in each zone varying as to zones, dependent on their distance from the mills, the difference in prices being due to a difference in the charges made for transportation.

On delivery of lumber to a customer under the modified plan, the customer has the option of paying the driver 30 per cent of the delivered price and the balance within a fixed time, less a discount of one per cent, or to pay the full delivered price within 30 days, without discount. Under the original and the modified plan, Stickle & Company includes in the delivered price a charge for transporting the lumber to the customer, based on the distance from the mill to the customer's yard.

The amount charged for transportation is materially less than the amounts charged by certified public carriers operating between the mills and the territory served by Stickle & Company. Stickle & Company has no certificate of public convenience and necessity authorizing it to engage in interstate commerce either as a common carrier or a contract carrier.

The amount which Stickle & Company receives from its customer, in excess of what it pays the mill for the lumber, approximates the charge which a carrier who has complied with the Motor Carrier Act and has a certificate of public convenience and necessity, would make for transporting the lumber.

All lumber transported by Stickle & Company belongs to it during the period of transportation. It does not solicit or advertise for transportation of lumber generally, and transports lumber only for delivery to its customers in fulfillment of contracts of purchase.

The major portion of Stickle & Company's capital investment is in its transportation facilities. The major portion of its payroll goes to its transportation employees. It has ten truck drivers and employs one or two salesmen who work part time.

### I

Process was served upon Stickle & Company in Oklahoma City in the Western District of Oklahoma. Stickle & Com-

pany filed a special appearance and moved to dismiss for want of jurisdiction, challenging the validity of the service of process. The trial court overruled the motion.

Sec. 222(b) of the Interstate Commerce Act, 49 U.S.C.A. § 322(b), in part reads as follows:

"If any motor carrier * * * operates in violation of any provision of this part [chapter] * * * or any rule, regulation, requirement, or order thereunder * * * the Commission * * * may apply to the district court of the United States for any district where such motor carrier * * * operates, for the enforcement of such provision of this part [chapter], or of such rule, regulation, requirement, * * * and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction * * *."·

Sec. 221(c) of the Interstate Commerce Act, 49 U.S.C.A. § 321(c), reads as follows:

"Every motor carrier shall also file with the board of each State in which it operates a designation in writing of the name and post-office address of a person in such State upon whom process issued by or under the authority of any court having jurisdiction of the subject matter may be served in any proceeding at law or equity brought against such carrier. Such designation may from time to time be changed by like writing similarly filed. In the event such carrier fails to file such designation, service may be made upon any agent of such motor carrier within such State."

Stickle & Company had not designated a service agent for the state of Oklahoma.

Carriers subject to Part II of the Interstate Commerce Act operate in numerous states and federal judicial districts. Many states have more than one judicial district. Congress provided for only one service agent in each state. The service agent may reside at any designated place in the state. He might reside in a district through which the motor carrier does not operate. The Act provides that such agent may be served with process "issued by or under the authority of any court having jurisdiction of the subject matter," and that if no service agent is appointed, service may be made "upon any agent of such motor carrier within such State." It seems clear to us that Congress has expressly provided for the service upon an

agent anywhere in the state, and does not confine service to the district. We conclude the motion was properly overruled.

## II

Sec. 203(a) of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 303(a) in part provides:

"(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to Part I [chapter 1 of this title], to which extent such transportation shall continue to be considered to be and shall be regulated as transportation subject to Part I [chapter 1 of this title].

"(15) The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation. * * *

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

■ The trial court found, in substance, that Stickle & Company is primarily engaged in the transportation of lumber for compensation under individual contracts with its customers; that the amount which Stickle & Company received from the customer for the lumber and the transportation thereof, in excess of the amount Stickle & Company pays the mill for the lumber, approximates the amount a carrier, who has complied with Part II, supra, and has a certificate of convenience and necessity, would charge for transporting the same lumber; that the transportation by Stickle & Company is not an incident to a commercial enterprise; and that, on the contrary, the buying and selling of lumber is a means and device employed by Stickle & Company to enable it to engage in the transportation of lumber as a contract carrier without complying with the provision of Part II, supra, respecting common carriers and contract carriers. We think the stipulated facts and the evidentiary facts and the legitimate inferences deducible therefrom fully warrant the findings made by the trial court.

■ Congress by the Act of September 18, 1940, 54 Stat. 899, amended the Interstate Commerce Act by inserting before Part I thereof a provision entitled "National Transportation Policy, 49 U.S.C.A. preceding section 1."[1] The Act should be liberally construed in the light of this declared policy.[2]

■■ The three definitions set forth in § 203(a), supra, must be read and construed together. Under the express provision of § 203(a) (17) a private carrier

[1] "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; —all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

[2] Piedmont & Northern Ry. Co. v. Interstate Commerce Commission, 286 U. S. 299, 311, 52 S.Ct. 541, 76 L.Ed. 1115.

means any person not included in the terms "common carrier" or "contract carrier" as defined in §§ 203(a) (14) and 203(a) (15).[3] A carrier may not avoid the requirements of Part II, supra, by subterfuge or device, or by posing as a private carrier when, in substance and reality, he is engaged under individual contracts in transportation by motor vehicle of property in interstate commerce for compensation.[4] Ownership of the commodity transported is not the sole test. The primary test in §§ 203(a) (14) and 203(a) (15) is transportation for compensation.[5]

For a time Stickle & Company offered to sell lumber at stated f. o. b. prices for acceptance at the mill or to sell lumber delivered to the customer at his yard at a stated f. o. b. mill price, plus a transportation charge set forth in a schedule, the transportation charge varying as to the distance from the mill to point of delivery. About the time of the trial below, Stickle & Company modified its plan. It began to quote delivered prices for lumber in designated zones. Different delivered prices were quoted in several zones. They were based on the distance from the mill to the zone. In other words, the quoted prices are based on the f. o. b. mill price of the lumber and the distance of transporation. The quoted prices in the zones nearest to the mill are lowest. The quoted prices in the other zones range upward from the lowest quoted price in proportion to their distance from the mills and embrace a greater charge for transportation.

For a time Stickle & Company entered into contracts with purchasers to sell them lumber and to transport the lumber from the mill to the customer's yard for a stipulated compensation to be paid for the transportation service on delivery of the lumber to the customer's yard. About the time of the trial, it sought to camouflage the transportation charge by collecting on delivery of the lumber 30 per cent of the total charge for the lumber and the transportation thereof instead of a stated charge for transportation. A. W. Stickle, vice-president of Stickle & Company, testified at the trial below that there was very little substantial difference in the two systems. Under the former plan, the customer agrees to pay a stipulated sum for the lumber and a stipulated amount for the transportation thereof. Under the latter plan, the customer agrees to pay a stipulated amount for the lumber and for the transportation thereof from the mill to his yard. In either case, the customer agrees to pay an amount which includes compensation to Stickle & Company for the transportation of the lumber. The change in the plan obviously was to avoid the provisions of Part II, supra, applicable to common and contract carriers.

What the court said in Georgia Truck System, Inc., v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210, 212, is apposite:

"We need not indulge here in any of these refinements. It is sufficient for us to say that the invoked statute is a highly remedial one, that its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of interstate or foreign transportation of property on the public highways for hire."

We think it unimportant that the technical title to the lumber remains in Stickle & Company until the transportation is completed and the lumber delivered to the customer. Prior to the transportation of the lumber and normally before the lumber has been purchased by Stickle & Company, it has entered into a contract to sell the lumber to a customer and to transport it to his yard. The lumber is transported and delivered by Stickle & Company in fulfillment of that contract to sell and Stickle & Company receives both pay for the lumber and compensation for its transportation from the customer.

The transportation is not merely incidental to the business of selling lumber. It is a major enterprise in and of itself. The major portion of Stickle & Company's capital investment is in that enterprise, and the major portion of its payroll goes to em-

[3] Dr. P. Phillips & Sons, Inc., Application for Exemption, 30 M.C.C. 773.

[4] Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457; Georgia Truck System, Inc., v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210, 211.

[5] New York, New Haven & Hartford R. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 26 S.Ct. 272, 50 L.Ed. 515. McBroom Common Carrier Application, 1 M.C.C. 423; Lyle H. Carpenter Common Carrier Application, 2 M.C.C. 85.

ployees engaged in that enterprise. The amount which Stickle & Company receives from a customer for the lumber and the transportation thereof, in excess of the amount it pays the mill for the lumber, approximates the charge that would be made under established rates for the transportation of the lumber by a carrier who has complied with Part II, supra, and has a certificate of convenience and necessity.

We conclude that, in substance and reality, Stickle & Company is engaged primarily in the transportation of lumber in interstate commerce by motor vehicle for compensation under individual contracts or agreements with its customers, and that it is a contract carrier by motor vehicle within the meaning of § 203(a) (15), supra.

The judgment is affirmed.

HUXMAN, Circuit Judge (dissenting).

I cannot agree with the conclusions reached by the majority. Section 203(a) of the Interstate Commerce Commission Act, as amended, 49 U.S.C.A. § 303(a), defines three classes of carriers: common, contract, and private carriers. Into which of the three classifications appellant falls must be determined from the Act itself. A common carrier is defined as one who holds himself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for hire. In plain words, a common carrier agrees and is bound to haul any person or the goods or property of any person over his route, who pays the transportation price or charge. A contract carrier is defined as one who by private contract transports a person or his goods for hire. The common factor of the two classes is that neither owns or has a proprietary interest in the property which he transports. A private carrier in general is defined as one who transports goods of which he is the owner, lessee or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise. The common or contract carrier has no interest or ownership in the property itself. His interest is entirely in its transportation under an agreement with the owner. His compensation or gain comes about only by a contract with the owner. The private carrier, on the other hand, has no contract with anyone for the transportation of goods, because the property he is hauling is

his own. These definitions in the Act are clear and without doubt as to what they mean.

At the time of argument, the government assumed the position that the adoption of the construction of the Act contended for by appellant would to a large extent nullify the beneficial purposes of the Act and would result in serious injury to common and contract carriers. This is no concern of the administrative agency nor of this court. If Congress failed to accomplish what it sought to do, it has power to rectify its failure to accomplish a lawful function.

I subscribe to the declaration of the majority that the Act should be construed in the light of the declared Congressional policy, but that does not justify us in expanding a definition beyond its clear import because we feel that otherwise the Congressional policy will fail. It is clear to me that, as defined in the Act, one who transports goods which he owns or in which he has a proprietary interest is a private carrier and not subject to the regulatory provisions of the Act. If such a construction results in unfair competition with common or contract carriers, the remedy lies with Congress.

Of course, a private carrier must be such in good faith. He may not become the nominal or ostensible owner of goods for the purpose of evading the Act. So if one takes the title to goods which are in fact the property of another, solely for the purpose of transportation, he is not a private carrier. If appellant camouflaged its transaction and in fact is hauling goods that belong to others, under a contract or agreement for hire, then it is a contract carrier, even though it may have taken the nominal title and ownership of the goods in itself for the purpose of evading the Act.

But what are the facts? Stickle was formerly in the wholesale and retail lumber business. Jackson was engaged in the retail lumber business, and also worked as a lumber salesman. They incorporated the appellant company. Its charter authorized it to buy and sell lumber at wholesale or retail or on a commission basis. It further authorized it to buy and sell at wholesale or retail other allied products, such as brick, paint, timber, and other products. Appellant solicits orders for lumber. It purchases its lumber from mills on the open market, buying wherever it gets the best prices, and paying its own money therefor. Most of the lumber is purchased to

fill orders previously secured. The percentage of lumber so purchased varies from forty to eight-five per cent of the total lumber bought, depending on the condition of the market. Appellant also maintains a lumber yard in Oklahoma City where some lumber is stored and from which place deliveries are made, although at times there is no lumber stored in this yard. Appellant quoted its customers two prices, an f. o. b. price and a delivery price. The f. o. b. price included the cost of lumber to appellant, plus an added commission. The delivery price consisted of the f. o. b. price, plus the transportation charges. At first, all deliveries were made by common carrier. After appellant had been doing business for about a year, it purchased trucks, and thereafter made deliveries of lumber mostly in its own trucks, although from ten to thirty per cent is still delivered by common carrier. It bought, paid for, and owned all the lumber it handled, whether sold f. o. b. or delivered. It did not haul for hire or transport property other than its own.

I attach no significance to the fact that appellant quoted an f. o. b. price which included the cost of the lumber to it, plus its commission, and a separate transportation charge in the event it delivered the lumber, rather than quoting a single price. The price of any article for sale consists of the cost, a reasonable profit, and transportation charges. Whether these items are stated separately or as a unit is immaterial. They are present and inherent in the price of any commodity offered for sale.

Neither is it of any significance that most or all of the profit results from savings in freight or reduced cost in transportation. If a wholesaler is so located that because of freight rates he finds himself unable to compete with a competitor more favorably situated, and therefore buys a fleet of trucks and delivers the merchandise he sells, and as a result thereof he can reduce his transportation costs enough so that he can not only make a profit but even undersell his competitor who delivers by common carrier, is he any the less a merchant? Is he not still a merchant even if his entire profit comes from savings in transportation costs? Does the fact that a merchant makes all his profit from reduced transportation costs result in a transmigration by which the soul of the merchant leaves his body and enters that of a transportation company? There is here no sub-

terfuge or camouflage for the purpose of evading the act. Appellant is engaged in carrying out the purposes for which it was chartered. In furtherance of that purpose, and in order to increase its profits, it provides its own means of delivery rather than utilizing those of a common carrier. But as a result thereof, under the decision of the majority, it has in effect forfeited its charter and ceased to be a merchant and has become a transportation company. I do not believe that we are justified in construing and giving such an effect to words and definitions which, considered alone, are clear and unambiguous, under the guise of interpreting and effectuating Congressional intent and policy. If the explicit and clear language of Congress leads to a result other than what it intended, it has the power to correct it. We should not do so by judicial interpretation.

For these reasons, I am forced respectfully to dissent.