## INTERSTATE COMMERCE COMMISSION v. TANK CAR OIL CORPORATION.

### No. 2721.

District Court, N. D. Georgia,
Atlanta Division.

Jan. 31, 1945.

S. Parker New, I. C. C., of Washington, D. C., and J. Ellis Mundy, Asst. U. S. Atty., of Atlanta, Ga., for plaintiff.

Hamilton Douglas and F. Lee Evans (of Douglas, Evans & Cole), both of Atlanta, Ga., for defendant.

RUSSELL, District Judge.

This is a suit by the Interstate Commerce Commission, as plaintiff, proceeding under the authority of the provisions of part 2 of the Interstate Commerce Act and section 222(b) thereof, 49 U.S.C.A. § 322(b), seeking to enjoin the defendant from operation as a distributor of gasoline without having obtained a certificate authorizing such operations as a motor carrier. A hearing has been had at which testimony was adduced, and the parties have argued the case by brief. The facts are found as follows:

### Findings of Fact.

The defendant is a corporation organized and existing under the laws of the State of Georgia, with its principal office and place of business in Atlanta, Georgia. Defendant owns and operates twelve retail gasoline filling stations in and near Atlanta, Georgia, and controls four such retail stations in which it furnishes pumps, tanks and other equipment under an agreement whereby these stations agree to purchase their gasoline from the defendant. The defendant operates several tank trucks and tractor-tank transports, by means of which it purchases both within and without the State of Georgia and transports such gasoline as is necessary to keep its stations supplied with stock sufficient for its retail sales. This gasoline is purchased largely in Birmingham, Alabama, St. Marks and St. Joe, Florida, and at Chattahoochee, a distributing terminal of the Southeastern Pipe Line Company near Atlanta, Georgia. When and if defendant is able to purchase more gasoline than is required for the operation of the retail stations, he makes sales of tank truck lots at wholesale to other dealers in the State of Georgia. In the period between June 12, 1943, and the time when the complaint was filed, December 20, 1943, this being when it is alleged the defendant illegally transported in interstate commerce gasoline for compensation, the defendant bought 343 truck loads of gasoline. It used 168 truck loads in its own retail stations, and sold 165 truck loads at wholesale to its controlled stations and other customers.

The complaint alleges eleven claimed illegal acts of transportation, and which are contended by the defendant were actual wholesale sales of gasoline. Proof was introduced of a statement by the managing officer of the defendant made to a representative of the plaintiff, and of testimony of two of the purchasers of the gasoline included within the eleven specified transactions.

During the period under investigation, an acute shortage of gasoline existed because of war conditions and the inference is clear that no dealer had on hand at all times sufficient stock to supply all demands.

The price at which the defendant made his sales to customers varied in proportion to the distance of delivery, but the defendant's testimony that the sales were made to meet competitive conditions is not contradicted. The difference between the price paid by the defendant at the terminal at Birmingham, and the price received from his wholesale purchasers, is slightly in excess of the contract hauler's freight rate for a haul from Birmingham to the place of ultimate delivery. However, the evidence discloses that the defendant took delivery of a considerable portion of his aggregate purchases from the terminal at Chattahoochee, Georgia, and plaintiff made no attempt to prove that there was any difference in the delivered price of this gasoline to customers close at hand and that secured on the delivery of gasoline purchased at Birmingham which involved a considerable haul.

The court finds that in essence the transactions complained of, and the general business of the defendant was, that the defendant was engaged primarily in transporting gasoline to supply the needs of its retail stations, and that when in the course of business it was able to and could secure gasoline in excess of the amount required for such purpose, it would dispose of such excess by completing a sale theretofore made. At times such excess would be on the yard at the time of sale, but in the majority of cases gasoline would have to be purchased by the defendant in order to fulfill the prior order.

Sometimes defendant would take the order and agree to deliver at the time in the future desired by the purchaser; at others, and the more frequently, it would require from two to fifteen days for delivery. At some times the defendant would merely state to the prospective purchaser that it did not have any gasoline, but would get it as soon as possible. Defendant had no storage tanks. The truck would be sent to the terminal, either at Birmingham,

St. Marks or Chattahoochee, with a check filled out but with the amount blank, and the terminal operator or seller would fill in the amount of the purchase price of the gasoline and invoice the same to the defendant, the load would be taken to the defendant's office in Atlanta and invoiced by the defendant at the sales price to the wholesale customer, and the truck then dispatched to such customer who would at that time deliver to the driver of the truck, or within a few days thereafter mail, a check to the defendant for the invoice price at which the gasoline had been sold to such customer. The gasoline was purchased by the defendant at the terminal at a price per gallon, plus State and Federal taxes, and was invoiced by the defendant to his customer at a price of so many cents per gallon, and in some instances at a price per gallon, plus taxes. The purchasers from the defendant bought the gasoline f. o. b. their station at an agreed price per gallon which included freight and Federal and State taxes, and to use the words of a witness, "did not know and did not care" where the gasoline came from. From the invoices introduced in evidence, it appears that as to the transactions with the two purchasers chiefly relied upon, the gasoline was transported from Birmingham, Alabama, and as to these, while the price received by the defendant from its purchasers was as to each sale the same, the corresponding purchases at the terminal upon occasion varied by as much as .37 of a cent per gallon.

The defendant was concerned in the transportation to the extent that it enabled it to keep its trucks in full operation, and such wholesale sales of gasoline not needed in the conduct of its retail business earned for defendant additional profits, in the earning of which it was necessary that the defendant buy and transport the gasoline. Under present conditions, all gasoline was readily salable, and even if the same had not been secured in fulfillment of prior orders, could have been disposed of in the defendant's trade area without storage in bulk.

The plaintiff fails to show by a preponderance of the evidence that as to any transaction there was other than a bona fide sale of gasoline f. o. b. the purchaser's station, in which the purchaser was buying gasoline and was not concerned in the price or cost of transportation. The plaintiff does not show by a preponderance of the evidence that in case of the majority of the sales by the defendant at wholesale, the gasoline was purchased by the defendant after a sale of the approximate or equivalent gallonage to his customer.

In an application in February, 1943, before the alleged illegal transportations beginning June 12, 1943, to the office of Defense Transportation for authority to purchase additional equipment, defendant stated the need of such new equipment to be because it was "unable to buy or lease any transport equipment. The equipment we now have is busy continuously and we are unable to keep up with orders on hand * * * our operation is the transportation of gasoline from the Southeastern Pipe Line Terminal to jobbers and gasoline agents in Georgia and South Carolina. It is our understanding that the Southeastern Pipe Line is approximately 200 orders behind. With the addition of this new piece of equipment we will be in a position to serve quite a number of additional agents." Following the denial of this application, in a letter seeking reconsideration, defendant stated: "As specified * * * we have been requested by the Republic Oil Company, the Southeastern Pipe Line Company, the Southport Gasoline Company, the National Oil Company, the Shell Oil Company, the Sinclair Oil Company and the Cities Service Company for equipment to transport gasoline in this area. All of these requests we were forced to refuse."

The defendant has failed to keep a driver's log in duplicate as required by the regulations of the Interstate Commerce Commission, and has likewise failed to secure or have in its files a certificate of physical examination signed by a qualified Doctor of Medicine for every new driver entering its employment as required by such regulations.

Defendant has not secured a certificate of public convenience and necessity from the Interstate Commerce Commission, nor has it filed policies of insurance or other security as required by the statute, nor has it filed with the Interstate Commerce Commission any rate or charge applicable to the transportation of property, or any minimum charge for such transportation of property.

### Discussion.

Complainant contends that the decision in this case is upon the facts controlled by the rule in the case of A. W. Stickle & Co. v. Interstate Commerce Commission,

10 Cir., 128 F.2d 155. In addition, complainant urges the accepted rule that the Interstate Commerce Act is entitled to a liberal construction to effectuate the policy of the act, and further, the established rule that the courts will look beyond the actual form of the transaction in determining whether questioned operations are those of a common or contract carrier, or private carrier. A. W. Stickle Co. case, supra, and Georgia Truck System, Inc., v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210. It also urges the accepted principle that interpretation of the statute by the Interstate Commerce Commission, the agent charged with its enforcement and operation, is entitled to great weight.

█ Upon consideration of the matter it appears that the real question for determination by this court is the actual nature of the transaction involved rather than a determination of the law, for if the operations of the defendant are those of a common or contract carrier, the complainant is entitled to the relief of injunction as sought. The Stickle case does not afford much help in determining the proper result in the present case. There the trial court found the circumstances of the transactions involved were transportations for compensation and that the Stickle Company was a common carrier. The Court of Appeals determined that there was sufficient evidence to sustain the finding under the facts in the case and thereupon held that the operations of the defendant were those of a contract carrier. The difference in the classification of the operations of the defendant by the trial court as those of a common carrier, and that of the Circuit Court of Appeals as those of a contract carrier, as well as the failure of the complainant in the present case to contend for any definite classification except that the defendant is not a private carrier, well illustrates that the difficulty inhering in the determination of any such a case is properly ascertaining the facts as to the actual circumstances of the operations, rather than a determination of the law. In the Stickle case the courts determined, under the facts there present, that the defendant was in fact engaged in the transportation of property for hire as a carrier. With this fact established, as a matter of law, the defendant became subject to all of the regulatory provisions of the statute including the proper subjection to an injunction by the court to prevent any viola-

tions thereof. The same court in Interstate Commerce Commission v. Clayton, 10 Cir., 127 F.2d 967, on the day prior to the decision in the Stickle case, held upon the facts there presented that the operations of the defendant were those of a private carrier. Thus each case must be determined by its own facts.

█ In this case, no extended discussion of the law involved is deemed necessary. Full findings of fact have been made. As to the law, before the complainant is entitled to the injunctive relief sought, it is necessary for it to convince this court that the operations of the defendant was "transportation for compensation as a common or a contract carrier," as held by the Interstate Commerce Commission in T. J. McBroom Contract Carrier Application 29370, 1 M. C. C. 425. This appears to be an excellent statement of the test. Thus, not that the transportation might result in compensation as a matter of profits to the seller or transporter, but that the effect of the transaction is compensation as a common or contract carrier. In the Stickle case the court found transportation for such compensation. In the present case, while the court finds that the transportation resulted in profit to the defendant, that is, that it was necessary to transport in order to earn the profit, nevertheless I am unable to find, under the evidence, that there was involved in the transportation any idea of freight or carrier charges. Under the undisputed and uncontradicted evidence, it made no difference where the shipment originated, the cost to the purchaser was the same. I do not believe that the fact that profit, or compensation, may accrue as a result of transportation is a sufficient test, for if that be so, one who lost money as a result of deliveries for fixed freight charges would not be a carrier. The real question in any case to be determined is, looking beyond the form of the transaction and to its circumstances, whether the transportation is for compensation as a common or contract carrier, or whether such transportation is incidental to the operation of a commercial enterprise. In this connection, I find nothing in the statute which prohibits the conduct of a bona fide wholesale business, even if transportation is usually and even exclusively employed as a means of its conduct, provided the operation does not in fact place the operator within the classification of a common or contract carrier. Thus the fact

that the defendant used no storage tanks, in itself does not subject it to the provisions of the statute.

 It is true that ownership of the goods transported is not the sole test whether one is a private carrier or otherwise. However, where bona fide ownership is shown, that fact is, under the definition of private carrier contained in the statute, entitled to considerable weight. And where bona fide ownership is shown, together with a failure to prove transportation for compensation as a common or a contract carrier, no proper basis exists for classification as a common or contract carrier. Indeed, this does not appear to be seriously questioned by the complainant, its contention is that the profit on the f. o. b. sales of the gasoline is the substantial equivalent of transportation charges between the points involved in the eleven transactions proved in detail, and that this, together with the evidence that the defendant always had an order before he purchased to fill it, shows that in essence the transaction was a subterfuge to evade the requirements of the statute. In view of the testimony from the complainant's witnesses that they purchased gasoline f. o. b. their stations, and neither knew nor cared from whence it came, and the testimony in behalf of the defendant that the prices charged were based upon competitive conditions in the respective localities, the inference sought to be drawn by the complainant is not entitled to the weight claimed for it. This is not a case where the business relates solely to transportation and wholesale sales. It is shown by the evidence that more than half of the gasoline transported by the defendant was delivered to its retail stations and there sold. As to this portion of the business it is conceded by the complainant that the operations were those of a private carrier. Under the facts here I can find no substantial difference between such transportation for sale at retail and the transportation for sale at wholesale, and accordingly conclude that the complainant has failed to show that in its wholesale operations the defendant is either a common or a contract carrier.

 Complainant relies heavily upon a statement made by the general manager of the defendant in which he admits that "we transport a spasmodic load now and then for somebody who calls in." Considering this statement in its context, and in connection with the evidence adduced upon the trial, I am unable to predicate thereupon a finding that the defendant's operations were the transportation of gasoline for compensation. The statement in its application to the Office of Defense Transportation that it had been requested to transport for various companies, is likewise not proof that it had been transporting, for it did not secure the additional equipment simultaneously stated to be necessary to carry on such operations.

In none of the decisions of the Interstate Commerce Commission cited and relied upon in the argument here were the facts similar to those here involved, and in them the element of transportation for compensation as a common or contract carrier clearly appeared.

There lurks in the background of this case circumstances which give rise to a suspicion that some operations of the defendant may be different than those disclosed by the evidence presented. However this suspicion is not sufficient to override the positive testimony in the record. Nor, being in opposition thereto, does it aid in establishing complainant's case by a preponderance of the evidence.

From the statements made, it is apparent that there are other cases of a similar nature pending, and as the case will doubtless be appealed for final adjudication, no further discussion is necessary.

 With reference to the matter of keeping of driver's logs and record of medical inspection, it is clear from the evidence that the defendant has failed to comply with the terms of the statute and regulations thereunder which are applicable to private carriers, and as to these matters, the complainant is entitled to an injunction to secure compliance with such statute and regulations. An order providing therefor may be presented.

### Conclusions of Law.

This court has jurisdiction of the parties and the subject matter.

The operations of the defendant are not subject to the provisions of the Motor Carrier Act so as to require it to obtain a Certificate of Convenience and Necessity, to file a tariff or statement of its minimum charges, or to file with the Commission the insurance or the filing and approval of surety bonds, qualifications as a self-insurer, or other securities or agreements by motor carriers subject to said act, duly

138

prescribed by said Commission pursuant to the provisions of Section 215 of said Act, 49 U.S.C.A. § 315.

The complainant is entitled to an injunction to restrain the defendant from violating the Motor Carrier Act by failing to keep and preserve driver's logs and certificates of medical doctors certifying to the good health of the drivers employed.

Defendant should be taxed one-half of the costs of this proceeding.

Let a decree be presented by the plaintiff upon notice effectuating these conclusions of law.