## INTERSTATE COMMERCE COMMISSION v. TANK CAR OIL CORPORATION.

### No. 11356.

Circuit Court of Appeals, Fifth Circuit.

Nov. 9, 1945.

Leo H. Pou, M. Neil Andrews, U. S. Atty., and Harvey H. Tisinger, Asst. U. S. Atty., all of Atlanta, Ga., for appellant.

Hamilton Douglas, Jr., of Atlanta, Ga., for appellee.

Before HUTCHESON, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

The Interstate Commerce Commission, conceiving that Appellee was engaged in the transportation of property for hire

either as a common, or contract, carrier, which had not complied with the applicable statutes, unsuccessfully sought an injunction in the Court below.

The evidence disclosed the following pertinent aspects of Appellee's business operation:

It owns and operates twelve filling stations for the retail sale of gasoline, oil, and kerosene; it has furnished all of the pumps, tanks, and other equipment in four additional filling stations under contracts which require the operators to purchase gasoline only from the Appellee; during the period under investigation it delivered 168 tank cars of gasoline to the twelve stations which it owns and 165 cars of gasoline to its four controlled stations and to customers generally; of the total of 333 carloads of gasoline so delivered approximately fifty per cent were to its own stations, twenty-five per cent to its controlled stations, and twenty-five per cent to outside customers; eighty per cent of its gross profits are from its retail sales of gasoline through its twelve stations; twenty per cent of its gross profits are from sales made at wholesale to its controlled stations and to outside retailers; it has $110,000 invested, of which $10,000 is invested in motor vehicles, one-half the use of which is appropriately allocable to its own retail business; it buys and owns all of the gasoline that it transports, the delivered price of which is based upon the competitive price of other dealers in gasoline at the point of delivery; no charge for freight or transportation, as such, is either quoted or made; the price quoted is F. O. B. purchaser's station and the price at which it is sold by Appellee is in no wise dependent upon the point at which Appellee purchased and received the gasoline so sold and delivered, and the fact that the gasoline was bought and received by Appellee at Birmingham, Alabama, Chattahoochee, Georgia, or Port St. Joe or St. Marks, Florida, had no effect in the price charged its purchasers; all gasoline was sold and delivered on orders taken anywhere from one to fifteen days prior to delivery to the purchaser; Appellee had no storage tanks of its own and because of the great shortage of gasoline during the period under investigation no storage tanks were necessary to the wholesaling business of the Appellee who always had a ready sale for any gasoline that its trucks brought to its place of business in Atlanta in excess of the needs of its own retail outlets; all sales were paid for on invoices made at the place of business of Appellee in Atlanta to which all gasoline was brought, before it was delivered; all sales were supposed to be for cash on delivery, but purchases were often not paid for until several days after the actual delivery; prices received by the Appellee for the sale of gasoline at wholesale were in excess of the usual price charged by contract haulers; although Appellee purchased much of its gasoline requirements at near-by Chattahoochee, Georgia, it made no distinction in the price of this gasoline to customers close at hand between the price it charged the same customers for gasoline purchased and delivered to Appellee at the greater distance of Birmingham; the Appellee refused employment to haul gasoline for other wholesale dealers; the Appellee was engaged in the transportation to the extent that it enabled it to keep its trucks in full operation and to realize a profit on the sale of such gasoline as it could haul, and sell at a profit, in excess of its own needs; all gasoline that it could secure under the conditions then existing was readily salable, and even if the same had not been secured in the fulfillment of prior orders it could readily be sold in the defendant's trade area without the cost and expense of storage in bulk and the double handling attendant upon such storage; the Appellee failed to comply with the provisions of the statutes relating to either a common carrier or a contract carrier of property for hire.

The usual course of business by Appellee differed from the usual course of business of contract haulers in these particulars: (1) The defendant bought the gasoline, paying out its own money at the time of delivery to its trucks. (2) It ran the risk not merely of the loss of freight charges but the loss of the gasoline as well in the event of the destruction of its trucks en route by fire or other casualty. (3) It ran the risk of the purchaser's failure to pay for the gasoline after delivery to purchasers who failed to pay on delivery. (4) It ran the risk of the failure or refusal of the purchaser to accept delivery of the gasoline after transportation to the purchaser's place of business, such as might be occasioned by the death of the purchaser, the failure of his business, or the destruction of his place of business by fire or other casualty. (5) The Appel-

lee assumed all risks that might be occasioned by the act of God prior to the delivery of the gasoline to the purchaser, whereas a contract carrier, under the common law, would ordinarily not assume such risk of loss to its cargo. Southern Ry. Co. v. Bateman, 173 Ga. 826, 162 S.E. 112; 9 Amer.Jur. 848, § 706. (6) The contract carrier bases his charges ordinarily upon the distance in which he hauls a commodity, whereas the Appellee based its charges upon the market price in the community where delivery was made without regard to the source from which it had obtained and transported the gasoline.

There is nothing in the record to support the charge that the defendant was engaged in transporting property as a common carrier. The only question is whether or not the defendant was engaged in the transportation of goods for hire as a contract carrier.

Part II of the Interstate Commerce Act relating to motor carriers, Sec. 303(a)(17), Title 49 U.S.C.A., defines a private carrier of property as follows:

"The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

Under the facts the defendant comes clearly within the statutory definition of a private carrier of property by motor vehicle. The defendant: (a) was the owner of property transported; (b)

was transporting it for sale; and (c) was transporting it in furtherance of its commercial enterprise as a dealer at wholesale and retail in the products which it transported. We have considered carefully cases by the Tenth Circuit, one of which deals with the transportation and delivery of coal (Interstate Commerce Commission v. Clayton, 10 Cir., 127 F.2d 967), and the other deals with the transportation and delivery of lumber (Stickle v. Interstate Commerce Commission, 10 Cir., 128 F.2d 155), but in each case the facts are greatly dissimilar to the facts here. Coal, for instance, may be transported and delivered in numerous types of vehicles, and so may lumber, and the delivery of those commodities to the customer by the seller is not a mandatory ingredient of a sale. Many of the purchasers of coal and lumber have their own, or other, trucks available to them by which to secure delivery of those commodities, but petroleum products are customarily handled in tank trucks having appropriate facilities such as a pump, hose connection, and the like, for the efficient and safe handling of such a volatile commodity, and every one knows that it is the general custom for the wholesale dealer in petroleum products to make delivery at the station and in the tanks of the retailer. Consequently the delivery of petroleum products sold at wholesale to the retailer is an essential and integral part of the business of a wholesaler of such commodities. There are other available alternatives for the delivery of lumber or coal.

The facts in the case of Interstate Commerce Commission v. Clayton, supra,[1] are more similar to the facts in the present case than are the facts in Stickle v. Interstate Commerce Commission, supra.

---

[1] Judge Phillips, speaking for the Tenth Circuit, in Interstate Commerce Commission v. Clayton, said [127 F.2d 969]:

"He always transports the coal to his home where he maintains a small coal yard and fills orders as received from the truck and coal stored in his yard. He makes no differentiation in price between coal delivered at Ucon and at the other nearby towns, although delivery to the other towns entails a longer haul. The price for which he sells is determined by competitive conditions.

"He does not hold himself out to the general public to haul coal for compensation. He does not haul coal for compensation to fill particular orders or under

individual contracts or agreements. He has indulged in no subterfuge or design to avoid the requirements of Part II of the Interstate Commerce Act. The cost of the coal and transportation is $5.57 per ton. He sells it for $8.50 per ton. Thus he realizes a profit, both from the transportation and from the sale of the coal, the margin of profit being large enough to cover both.

"We conclude he is engaged in the bona fide coal business; that he transports coal of which he is the owner for the purpose of subsequent sale and in furtherance of a commercial enterprise; and that the trial court was warranted in finding that he is a private carrier."

■ We agree with the contention of the Commission that the ownership of property is not necessarily controlling in determining whether the transportation by such owner constitutes carriage for hire or private carriage. We agree, also, that the acquisition of title to the goods transported cannot be used as a subterfuge by the carrier for evading compliance with the statute. We think that Congress not only intended to say, but said, that if a person, in good faith, transports his own property for the purpose of sale or in furtherance of his own commercial enterprise he is a private carrier and, therefore, is not subject to the provisions of the Act.

The findings of the lower Court are supported by the evidence, and its conclusions of law are likewise correct.

Affirmed.