### TAYLOR
### v.
### INTERSTATE COMMERCE COMMISSION.
### No. 13512.

United States Court of Appeals,
Ninth Circuit.

Dec. 4, 1953.

Hickson & Dent, Seymour L. Coblens, Portland, Or., for appellant.

Henry L. Hess, U. S. Atty., Donald W. McEwen, Asst. U. S. Atty., William L. Harrison, Portland, Or., for appellee.

Before DENMAN, Chief Judge, and McCORMICK and GOODMAN, District Judges.

DENMAN, Chief Judge.

Taylor appeals from a judgment on a complaint of the Interstate Commerce Commission, hereafter the Commission, holding he is a "contract carrier by motor vehicle" under 49 U.S.C.A. § 303 (15) of the Interstate Commerce Act, hereafter the Act, and, since he has no authorization therefor by the Commission, enjoins him from transporting in interstate commerce his lumber in his wholesale business of buying finished lumber in Oregon, transporting it and selling it f. o. b. to retail yards in Idaho.

The Commission contends a policy of Congress requires us to give a liberal interpretation to the Act in favor of establishing that Taylor is a contract and not a private carrier. "Liberal" is a weasel word in this connection. The policy of the Act declares as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of *all modes* of transportation subject to the provisions of this Act, so administered as to recognize and *preserve the inherent advantages of each;* * * *." (Emphasis supplied.) Transportation Act of 1940, § 1, 54 Stat. 899, 49 U.S.C.A. note preceding section 301.

One of the modes of transportation subject to the Act, as having "inherent advantages" is that by private carriers of their own property. This is stated in 303(17) as follows:

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle'

or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

We think that in interpreting this paragraph and paragraph (15) providing for "contract carriers" later considered, there is no rule of interpretation more liberal for one than the other.

The burden of proof on the Commission is to establish that Taylor was not a person who transports in interstate commerce by motor vehicle lumber of which he is the "owner," which transportation is for the "purpose of sale"— that is, that he is not a private carrier under paragraph (17)—but that he carries "under individual contracts or agreements" with other persons for mere carriage of the lumber for "compensation" to be paid Taylor by them and hence is a carrier for hire under paragraph (15) as follows:

"(15) The term 'contract carrier by motor vehicle' means any person which, *under individual contracts or agreements, engaged in the transportation* (other than transportation referred to in paragraph (14) of this section and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce *for compensation.*" (Emphasis supplied.)

■ We construe this section to require the Commission to maintain its burden of proof of the existence of a contract express or implied between Taylor and the person to whom he sold lumber which provides a "compensation" for him to engage in carrying the lumber in interstate commerce for them. Clearly, there was no express contract for such a carriage for hire, for the only contract he had with his buyers was to sell them lumber f. o. b. their yards in Idaho.

There is not a shred of evidence in the record that a buyer of his lumber in Idaho *knew* when he made his purchase contract f. o. b. his yard, that Taylor was to bring it to him in Taylor's own trucks, much less agreed that Taylor was so to carry it *in interstate commerce* at all, much less that he was so to carry it under one of the "individual contracts" of paragraph (15) between Taylor and him, for which carriage they were to pay him "compensation." Taylor's uncontradicted evidence is that they did not know where or from whom he acquired the lumber he sold them. Clearly, Taylor's buyers made no agreement with him which expressly required him to transport the lumber to them in any particular vehicle or from out of the State of Idaho and no express agreement for compensation for the use of his trucks.

On the question whether there was an implied agreement for such a carriage for hire, a review of Taylor's wholesale business for the year 1950 shows that he made a capital investment in Oregon totaling $123,997 in 90 successive contracts which he carried in his own three trucks of an average value of $16,666 to his Idaho retail lumber customers on his f. o. b. contracts for $151,629. Assuming a five-year life of the trucks (see Bureau of Internal Revenue Bulletin F), on the average each truck for its year's value of $3,333 carried lumber costing over $40,000.

One of the court's findings is that Taylor's "only business investment is in his truck equipment * * *." This is clear error. The trucks are not Taylor's "only business investment."

It is uncontradicted that Taylor's lumber business with the retail lumber sellers who buy from him was not in all kinds of lumber, finished and raw. It was in highly finished lumber in particular dimensions in which his buyers were short of stock. For Taylor to have on hand all of the various dimensions his buyers at any time in the future might require he would need a huge yard in which Taylor would have a stock of every one of these dimensions. Such a

capital investment well could make his enterprise one of heavy losses.

Hence Taylor, one of the smaller business men Congress has committees to protect, managed his selling and subsequent buying of his lumber in his own home in Canby, Oregon, at a managerial effort, the value of which the Commission with the burden of proof has not shown. Likewise, his wife there kept his books for a compensation the Commission did not show. In his so dealing with his retail customer, Taylor saves him the fee of a broker, the uncontradicted evidence being that most of these retail yards employ a broker to procure their needed lumber.

The court found that Taylor's f. o. b. contracts of sale preceded his purchase of the lumber to fulfill them. Hence his "primary business" was to keep himself so informed of the varying conditions of the finished lumber market that he could satisfy each of his customer's contracts by purchasing the required items for these contracts from lumber manufacturers in the often fluctuating prices of the lumber market. It was a risk of this primary business that in each case *after* contracting with his buyer he could purchase the lumber at a price low enough to yield himself a profit. No common or contract carrier assumes such a business risk, a fact the district court ignored.

Concerning the 90 contracts in 1950 on which Taylor received $27,653.00 above the cost of lumber and its transportation to each of his customers, the district court to support its view of such an implied contract of carriage finds:

"(h) Taking all of the shipments as a whole, the net sum accruing to the defendant on lumber sales is an amount which compares favorably with transportation charges of duly authorized carriers for similar shipments based upon the published rates on lumber per thousand board feet on a mileage basis. On individual shipments as appear on defendant's Exhibit 1, there is considerable variation between the tariff rate and the difference between the defendant's buying and selling price. The distance traveled is a factor in setting the selling price of the lumber."

The comparison is valueless because it is with the published rates of a certain group of contract truckers who agreed on certain rates, without proof that other contract truckers had the same rates or that Taylor, if he regarded himself as a contract trucker, would not have had a different rate.

The comparison is further not pertinent because it ignores the value of Taylor's managerial service to the transaction in his finding sellers to him at a price low enough to afford him a profit, or the cost of his bookkeeping. Assuming the equivalent of as low a brokerage charge in his lumber buying of 3% on his $123,977 of purchases and $100 per month for a bookkeeper, there should be deducted from the $27,653 at least $5000. With what truck hire would this $22,653 "compare favorably"?

Furthermore, treating *as a lump sum* the annual profit of the 90 sales contracts with often a greater number of truck hauls is entirely inconsistent with the legal obligation of a contract trucker as to each truck haul. If Taylor had had a contract with anyone to carry that person's goods for a consideration in interstate commerce, his regimentation as such a contract carrier would have required of him that he post and file with the I.C.C. a schedule of minimum rates; and no charges less than the minimum rates so published may be made. 49 U.S.C.A. § 318(a); 49 C.F.R. §§ 187.0–187.10.

Since the theory of the Commission and of the court below is that Taylor's gross profit on his lumber sales was in effect freight charges, an affirmance of the judgment would mean that as to each of Taylor's orders in 1950 Taylor would have been required to set a fixed profit on his lumber sales and would not be allowed to obtain less than that profit plus the cost of the lumber, regardless

of the state of the market in which he purchased it.

Since Taylor bought his lumber to fulfill each f. o. b. contract *after* making such a contract of resale, if *on any shipment* his purchase price thereof so thereafter made in a rising market was high enough to give him no profit at all, he would violate the law if he delivered the lumber to the buyer at the agreed price because he would be hauling at less than his established minimum rate.

Unless he violates the law and delivers the lumber, he would breach his contract with his buyer and would be liable in a suit for damages. Obviously no one without a lumber yard would dare to buy lumber to fulfill his sales contract, transport it in his own trucks and deliver it f. o. b. to his vendee. The Commission has not maintained its burden of proof that Taylor's f. o. b. contract for the sale of his lumber was an implied contract to carry his own lumber for them as a contract carrier.

The cases clearly indicate that Taylor's carriage of his own lumber in his own trucks for f. o. b. delivery to his buyers is that of a private carrier. We adopt without quoting it the language of Judge Dobie in the three-judge case of Brooks Transp. Co. v. United States, D.C.E.D.Va., 93 F.Supp. 517, 524, affirmed 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668:

"In the 'Hearings before the Committee on Interstate Commerce, United States Senate, 74th Congress, 1st Session on S. 1629' (Government Printing Office, Washington, 1935), page 86, the late Commissioner Joseph B. Eastman testified as follows in response to questions asked by Senators Hastings and Wheeler (as to whether the proposed bill to regulate motor carriers would regulate the transportation by owners of their own goods being transported to their customers):

" 'Well, I was going to say that in instances where the trucker actually buys the products which he transports, if that is a bona fide transaction and not merely a device to evade regulation, he would be a private carrier.'

\* \* \* \* \* \*

"Again, during the debate on the Act, Senator Wheeler pointed out: 'The definition of "private carrier of property by motor vehicle" is tranferred by the Committee from a later section and applies to persons transporting their own goods in their own vehicles for commercial purposes. The only regulation to which such carriers are subjected is that with respect to the maximum hours of service and qualifications of employees and the safety of operation and equipment—section 204(a) (3).'

"To like effect is the statement of Senator Reed: 'I think the time may come when we shall have to regulate the transportation of private property by the owner of such property when it is transported for commercial purposes. But I fully concur in the statement of the chairman of the committee that there is nothing in the bill which undertakes to do it.'

"Again, note the dialogue between Senators McKellar and Wheeler:

"Mr. McKellar: 'To use the illustration I gave a while ago, if a private concern in Memphis, Tenn., desires to deliver its goods to the South, in Mississippi, or to the West, in Arkansas, it may do so without coming within the provisions of the bill?'

"Mr. Wheeler: 'Exactly. The most attempted to be done—that has not been done—is to try to regulate the safety conditions. There is a provision in the old law, which remains the same with respect to safety provisions.' "

As was said by Judge Waller in a Fifth Circuit case holding a similar enterprise of carriage of one's own goods to an

f. o. b. sale involved a private carrier, in I.C.C. v. Tank Car Oil Corp., 151 F.2d 834, 835, at page 837:

"* * * We think that Congress not only intended to say, but said, that if a person, in good faith, transports his own property for the purpose of sale or in furtherance of his own commercial enterprise he is a private carrier and, therefore, is not subject to the provisions of the Act."

The case is identical with I.C.C. v. Woodall Food Products Co., D.C.N.D.Ga., 112 F.Supp. 639, where as here Woodall had no storage yard, bought its goods in the condition in which it sold them to its customers at a delivered price and itself carried them interstate to its buyers in trucks which it leased. The fact that Woodall had leased rather than owned the trucks on which it carried the goods does not change the character of Woodall's transport.

In I.C.C. v. Scott, No. 4439, D.C.D.N.M., decided June 3, 1953 (unreported), Judge Hatch's decision holding Scott a contract carrier is based on the same grounds as ours, namely, that to be a private carrier there must exist a chance of profit or loss on the purchases and sales of his own goods which he carries in his own trucks. Scott carried oil he contracted to be purchased from a single New Mexico refinery which he agreed to sell to the Shell Co. at its several stations in Arizona. Concerning the controlling absence of any profit on the oil transaction, Judge Hatch states:

"It is significant that the prices contracted to be paid at the refinery and the prices contracted to be received from Shell except for transportation and taxes are in effect the same. Prices, including possible fluctuations, are to be determined by Platt's Oil Gram Price Service. There was no possible way for Scott to make any profit from the purchase and sale of such products as is done in the ordinary business transaction. It takes no stretch of the imagina-

tion to know that one engaged in legitimate buying and selling operations makes a profit or takes a loss on the purchase and sale. * * * From all the evidence, Scott was selling transportation and nothing more. [Emphasis added.]"

If the I.C.C. unreported case of Meat Produce Dispatch, Inc., No. MC112332, is not in agreement with the above cases, we do not accept it as a correct statement of the law.

Here is no device or subterfuge such as in Georgia Truck System v. I.C.C., 5 Cir., 123 F.2d 210, 211, where to escape the Act the owner's trucks were leased to others, but where they were nevertheless operated by the lessor owner in his business of transporting the goods of others. Similar is Interstate Commerce Commission v. Pickard, D.C.W.D.N.Y., 42 F.Supp. 351.

Here there is no agreement to carry the owner's goods to his vendee for a fixed carrying charge payable by buyer as in I.C.C. v. Jamestown Sterling Corp., D.C.W.D.N.Y., 64 F.Supp. 121, 123. Nor such a situation as in A. W. Stickle Co. v. I.C.C., 10 Cir., 128 F.2d 155, where at page 157 the court finds that Stickle Co., through a carrier of its own goods, gave the buyer a "freight bill or loading tally" for the transportation cost which amount the buyer was required to pay to Stickle Co.'s driver. Also, "In order to give the customer an opportunity to take a two per cent discount for prompt payment, Stickle & Company send an invoice to the customer showing the price of the lumber, on which the discount is allowable, separate and apart from the payment made by the purchaser as advances to the driver."

Since in contracting to sell the lumber f. o. b. in Idaho and thereafter buying his lumber in Oregon and transporting it in his trucks and delivering it to his vendees, Taylor is a private carrier, the judgment is reversed and the case remanded to the district court and it is ordered to enter a judgment denying the injunction sought by the Commission.