## INTERSTATE COMMERCE COMMISSION
v.
## ASPHALT SUPPLY COMPANY and Robert O. Wilson.

### Civ. A. No. 1596.

United States District Court
N. D. Texas,
Abilene Division.

June 19, 1957.

———◆———

Bernard H. English, Regional Attorney, William W. Guild, Fort Worth, Tex., Attorney for Interstate Commerce Commission.

Carl L. Phinney, Leroy Hallman, Dallas, Tex., for defendants.

ESTES, District Judge.

This action was instituted by the Interstate Commerce Commission pursuant to Section 322(b), Title 49 U.S.C.A., seeking to enjoin Asphalt Supply Company, a corporation, and Robert O. Wilson, its president and principal owner, from operating as a motor carrier in violation of Part II of the Interstate Commerce Act (Title 49 U.S.C.A. § 301 et seq.). The Commission alleged that the defendant, Asphalt Supply Company, is a common carrier under the definition of Section 303(a) (14) of the Act, or in the alternative, is a contract carrier under the definition of Section 303(a)(15) of the Act. The Defendant claims to be a "private carrier" under the definition of Section 303(a)(17) of the Act.

There was no evidence presented showing the defendant to be a common carrier, and that alternative was abandoned by the Commission.

Defendant Robert O. Wilson, president of Asphalt Supply Company, has, for the past several years, been employed by the Cosden Petroleum Company as sales manager of its asphalt products, and in charge of the contractual arrangements for their sale and transportation. Cosden manufactures asphalt at its plant in Big Spring, Texas; and prior to 1956, sold to purchasers in New Mexico, Colorado, Oklahoma and other states. One of the principal customers in New Mexico was Spencer and Company of Santa Fe, New Mexico, who had purchased asphalt directly from Cosden in Big Spring, Texas, for six or seven years prior to 1956. Most of the asphalt was transported from Big Spring, Texas, to places in New Mexico by Art Tucker Transport, a contract carrier in New Mexico.

Art Tucker Transport maintained an office and equipment at Big Spring, Texas. It is not known what negotiations were had between Spencer and Cosden as to the price of the product purchased by that concern; however, when Spencer wanted a shipment of asphalt, he would either telephone or teletype an order to Art Tucker Transport at Big Spring, Texas. These orders specified the quantity and type of asphalt and the destination. Art Tucker Transport would then make out a "load-out" order and dispatch a truck to the refinery, where Cosden made out a manifest, loaded the truck out, and the truck moved to its destination.

Transporting asphalt out of Cosden Refinery from Big Spring, Texas, to New Mexico was a major portion of Art Tucker Transport's business, out of which it netted, before taxes, over $125,000 for the years 1954 and 1955. Mr. Robert O. Wilson was in a position to know that Art Tucker Transport had a profitable business.

Asphalt Supply Company was formed in December 1955, and thereafter Spencer was unable to purchase asphalt directly from Cosden f. o. b. the refinery. It had to purchase through Asphalt Supply Company.

Eighty percent of the sales made by Asphalt Supply Company was made to Spencer and the procedure was generally as follows:

Robert O. Wilson, who acted as Asphalt Supply Company's only salesman, contacted Spencer to determine the approximate quantity it would require for the year 1956, and the price between Spencer and Asphalt Supply Company was negotiated at that time.

Asphalt Supply Company would then advise Cosden Manufacturing Company what its requirements in New Mexico for the year would be, and the price negotiated with Cosden Manufacturing Company was set out. Generally the price negotiated with Spencer at the beginning of the year was the price charged, but in specific instances, Asphalt Supply Company billed Spencer and Company at a price lower the negotiated price, although the cost of transportation to Spencer and Company was not reduced.

An order would be received from Spencer and Company by Asphalt Supply Company at Big Spring, Texas, which set out the quantity and type, and the destination of the asphalt. Asphalt Supply Company would then dispatch a truck to the Cosden Refinery, where Cosden would issue a manifest, load the truck out, and the truck moved to destination. The only significant difference in the operations of Art Tucker Transport and Asphalt Supply Company as far as transportation of the asphalt is concerned, was the fact that Asphalt Supply Company owned the material it transported; they were billed by Cosden, and in turn, Asphalt billed Spencer; thus assuming the risk of loss of the asphalt in transit, and the failure of Spencer and Company to accept the asphalt, or after acceptance, Spencer's refusal to pay for the asphalt, or the transportation thereof.

Through September 1956, Asphalt Supply Company transported and delivered 962 shipments, out of 1,162, in its own trucks. As of 30 September 1956, Asphalt Supply Company's gross sales amounted to $319,758.13, and its gross income from transportation was $162,722.16, of which amount $12,417.37 was paid to authorized carriers for hire. Asphalt Supply Company operated approximately 15 vehicles, leased from other parties, and employed some 20 drivers. Its transportation rates are computed at a rate per 100 pounds, according to the distance hauled and was precisely the same as that charged by Art Tucker Transport, a contract carrier. The purchaser of the asphalt paid these charges.

Asphalt Supply Company's books were set up so as to account for the functions of sales and deliveries, separately, in order to determine whether there was a loss or profit on each of the functions. The books as set up show a loss on the transportation function, however, the method of accounting for certain items of expenses was disputed by the government, which claimed that Asphalt Supply Company made a profit out of transportation.

I do not think it necessary to determine whether a profit was made, but I do find that the purpose of the transportation activities was to make a profit, whether one was actually made or not.

Asphalt Supply Company replaced a contract carrier that was profiting from transporting asphalt from Big Spring into New Mexico. Its transportation was the result of preexisting orders. It charged extra for transportation and at the same rate of the contract carrier it replaced. The major portion of its investment was in transportation facilities. Over 80% of its asphalt was purchased to fill prior orders or commitments, and its transportation of asphalt was not merely incidental to or in aid of its business of selling asphalt— it was a major enterprise in and of itself. Accordingly, I find that Asphalt Supply Company is operating as a contract carrier and should be enjoined from operating as such. A. W. Stickle & Co. v. I. C. C., 10 Cir., 1942, 128 F.2d 155.

This decision is not adverse to I. C. C. v. Tank Car Oil Corp., 5 Cir., 1945, 151 F.2d 834, for it was therein stated that the fact of ownership of the goods transported is not necessarily controlling and cannot be used as a subterfuge or design for evading compliance with the Act; nor is Asphalt Supply Company engaged in carriage of "a very small percentage" of products manufactured by it or its subsidiaries and supplies used by them, as in Brooks Transp. Co. v. U. S., D.C. E.D.Va., 93 F.Supp. 517.

I conclude that the real, primary and only bona fide[1] business of Asphalt Supply Company was the transportation of asphalt by motor vehicle in interstate commerce for compensation; that it is a contract carrier and not a private carrier under the Interstate Commerce Act and that plaintiff is entitled to the relief prayed for herein.

Counsel for plaintiff will present a decree in accordance with this memorandum decision.

---

[1]. Cosden would have been entitled to the fruits of the activities of Wilson, its sales manager, in selling its products. See: Hunter v. Shell Oil Co., 5 Cir., 1952, 198 F.2d 485; Fleishhacker v. Blum, 9 Cir., 1940, 109 F.2d 543, certiorari denied 311 U.S. 665, 61 S.Ct. 23, 85 L.Ed. 427; Mechem on Agency (2d Ed.) Sections 1191, 1198–1199, 1206.