Morris STUDNA, d/b/a Jett Motors, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 13968-4.

United States District Court W. D. Missouri, W. D.

Jan. 23, 1964.

Kretsinger, Kretsinger & Edell, by Tom B. Kretsinger and John F. Edell, Kansas City, Mo., for plaintiff.

John H. D. Wigger, Dept. of Justice, Washington, D. C., F. Russell Millin, U. S. Atty., Kansas City, Mo., for defendants.

Francis A. Silver, Assoc. Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

Before RIDGE, Circuit Judge, and OLIVER and BECKER, District Judges.

BECKER, District Judge.

In this action under Section 1336, Title 28 U.S.C.A. plaintiff, a wholesale automobile distributor, seeks to set aside certain orders of the Interstate Commerce Commission (hereinafter referred to as the Commission) requiring the plaintiff to cease and desist from his so-called "Plan 2" operations, hereinafter described.

On March 19, 1959, the Commission (acting through its Division 1) instituted an investigation under Section 204 (c) [1] of the Interstate Commerce Act (hereinafter referred to as the Act) to determine whether plaintiff, Morris Studna, doing business as Jett Motors, had been and was then engaging in the transportation of property in interstate or foreign commerce, for compensation, as a common or contract carrier by motor vehicle, in violation of Section 206(a) (1) or 209(a) (1), of the Act.[2]

After a hearing the examiner found that plaintiff was not violating either of said provisions of the Act, and recom-

1. Section 304(c) of Title 49 U.S.C.A.

2. Section 306(a) (1) and 309(a) (1) of Title 49 U.S.C.A.

mended the entry of an order discontinuing the proceeding.

Thereafter exceptions to the findings were filed by the Commission's Bureau of Inquiry and Compliance. On these exceptions, the Commission, through Division 1, concluded that, although the examiner correctly determined that plaintiff's "Plan 1" operations did not require operating authority, plaintiff's Plan 2 operations constituted for-hire transportation of automobiles for which a certificate of public convenience and necessity was required under Section 206 (a) (1) or Section 209(a) (1). Thereupon, the commission issued its cease and desist order.

After the denial of his petition by Division No. 1, plaintiff then filed a petition for reconsideration, of the actions of the Commission in respect of the Plan 2 operations. This petition was denied by Division 1, acting as an Appellate Division.

Plaintiff then filed this action. An injunction was entered by this Court pending final adjudication of the issues involved. The effective date of the cease and desist order was postponed. A three judge court was convened pursuant to Title 28 U.S.C.A. § 2284.

## FACTS

The facts in this case are not disputed. Plaintiff is a wholesale automobile dealer whose principal place of business is in Kansas City, Missouri. He purchases both new and used automobiles from dealers, and at auctions, in the Kansas City area. These automobiles are then resold chiefly to West Coast dealers.

Plaintiff transports automobiles across country according to two distinct plans, only one of which has been found illegal by the Commission.

## PLAN 1 OPERATIONS

Under Plan 1 plaintiff transports automobiles owned by him to dealers who have contracted to purchase them from him. Deliveries are effected by what is known in the industry as the "driveaway method." The automobiles to be delivered are driven by qualified drivers who are obtained through solicitation in the personal "Want-Ad" sections of Kansas City newspapers. Drivers must be over twenty-five years of age, must have a valid driver's license and must present "good references." No drivers are used on a regular "on-call" basis, though some may be used more than once. Although some drivers, known to plaintiff, are not required to post bond, most must deposit $25.00 with plaintiff. Upon safe delivery of the automobile to the purchaser-dealer that sum is then refunded to the driver by the purchaser-dealer. Plaintiff reimburses his customer for this refund, usually by a reduction in the purchase price. The driver pays for all operating expenses of the trip (except gas and oil) and minor vehicular repairs not exceeding $25.00. Plaintiff provides all insurance, permits and license plates for the interstate movements. Upon delivery to plaintiff's customer, the driver is reimbursed for the cost of fuel and minor repairs by the purchaser-dealer and he, in turn, secures reimbursement by deducting these charges from plaintiff's selling price. Upon departure of the vehicle, plaintiff notifies the customer by telegram. Title to the vehicle is mailed to the customer with a sight draft. Title to and responsibility for the vehicle remains in plaintiff until the sight draft is honored or the vehicle otherwise disposed of. Both the examiner and the Commission found that these Plan 1 operations fell within the statutory definition of "private carriage" as set forth in Section 203 (a) (17) of the Act,[3] on the ground that such operations were incidental to, and in furtherance of, plaintiff's primary business as a wholesale automobile dealer.

## PLAN 2 OPERATIONS

Plaintiff's Plan 2 operations differ from his Plan 1 operations in that under this plan plaintiff transports automobiles

---

3. Section 303(a) (17) of Title 49 U.S.C.A.

owned at the outset by West Coast dealers. These automobiles are purchased by the West Coast dealers from someone in Kansas City other than the plaintiff. According to plaintiff, he transports these automobiles to his actual or potential customers solely for "good will" purposes, thus aiding his primary business of selling automobiles. Plaintiff advertises this Plan 2 service by maintaining a sign at a Kansas City auction house informing interested dealers of this service, advertised as free of charge. Under Plan 2 plaintiff prepares the automobiles for transportation by checking them mechanically, lubricating them, checking and servicing the tires, taping the chrome on the front of the car, covering the front of the hood with heavy waxed paper, and by furnishing license or shipping tags. Further, plaintiff provides inside storage for the vehicles until their departure. When the vehicle leaves for its destination, plaintiff sends a telegram, at his expense, to the dealer to whom it is to be delivered.

Under Plan 2 plaintiff obtains drivers in the same manner as he does for his Plan 1 operations. However under Plan 2 plaintiff retains the $25.00 deposit given by the driver. The driver is subsequently reimbursed at the destination for expenditures and the deposit of $25.00 by the dealer-owner. Before the transportation under Plan 2 begins, plaintiff requires the driver to execute a printed form provided by him which is designated "Independent Contractor Agreement." This agreement is in a form prepared for signature by both the driver and the owner of the car although, in fact, only the signature of the driver appears on the form.

Plaintiff estimates that his Plan 2 operations constitute about one per cent of his transportation operations, and that Plan 2 operations ordinarily occur only two or three times a month, but sometimes occur five or six times a month. This testimony was not effectively con- tradicted by the Commission, and will be assumed to be true.

### APPLICABLE STATUTES

The relevant portion of Section 206(a) (1) [4] of the Act, providing for operations in interstate commerce by a common carrier, is as follows:

"Except as otherwise provided in this section and in section 310a of this title [pertaining to dual operations], no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operations on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations * * *."

Section 209(a) (1) of the Act,[5] provides, in essence, the same requirement for contract carriers.

A common carrier by motor vehicle is defined by Section 203(a) (14) of the Act,[6] as:

" * * * any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes * * *."

A contract carrier by motor vehicle is defined by Section 203(a) (15) of the Act,[7] as:

" * * * any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a)

4. Section 306(a) (1) of Title 49 U.S.C.A.

5. Section 309(a) (1) of Title 49 U.S.C.A.

6. Section 303(a) (14) of Title 49 U.S.C.A.

7. Section 303(a) (15) of Title 49 U.S.C.A.

for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designated to meet the distinct need of each individual customer."

Every person falling within the definition of either a common carrier or of a contract carrier must obtain operating authority from the Commission.

No such authority, however, is required of a private carrier of property by motor vehicle. A private carrier is defined by Section 203(a) (17) of the Act,[8] as:

> " * * * any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

In interpreting this definition of a private carrier the Commission and the courts early adopted and applied to the individual fact situations before them the so-called "primary business" test. This test was enunciated by the Commission in Lenoir Chair Co. Contract Carrier Application, 51 M.C.C. 65, where applicant manufacturers, engaged in transporting in their own trucks the products they manufactured and, when possible, loading the trucks with manufacturing supplies for the return movement, were found to be private carriers. There the Commission said:

> "If the facts establish that the primary business of an operator is the supplying of transportation for compensation, then the carrier's status is established though the operator may be the owner, at the time, of the goods transported and may be transporting them for the purpose of sale. . . . If, on the other hand, the primary business of an operator is found to be manufacturing or some other noncarrier commercial enterprise, then it must be determined whether the motor operations are in bona fide furtherance of the primary business or whether they are conducted as related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion they cannot be both. A finding that a company is engaged in performing transportation for compensation with a purpose of profiting therefrom is inconsistent with and precludes a finding that the motor operations are conducted in bona fide furtherance of its other and primary commercial enterprise."

The Commission's interpretation was challenged before a statutory three-judge court in Brooks Transp. Co. v. United States (E.D.Va.) 93 F.Supp. 517, aff'd, 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668. In this case the Commission's determination, including the application of the primary business test, was sustained by the Court, which said:

> "The Commission, in deciding that Lenoir and Schenley were private carriers, as opposed to contract carriers, or common carriers, applied what is known as the *primary business test*. In other words, if it is established that the primary business of a concern is the manufacture or sale of goods which the owner transports in furtherance of that business and the transportation is merely incidental thereto, the carriage of such goods from the factory or other place of business to the customer is private carriage even though a charge for transportation is included in the selling price or is added thereto as a separate item." 93 F.Supp. at page 522

---

8. Section 303(a) (17) of Title 49 U.S.C.A.

Despite the decision in the Brooks Transportation Cases, supra, the Commission was not consistently successful in its attempts to secure judicial approval of its application of the primary business test. The Commission's application of the test was disapproved in the following cases: Taylor v. Interstate Commerce Commission (C.A.9) 209 F.2d 353, cert. denied, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098; Interstate Commerce Commission v. Woodall Food Prod. Co., Inc. (C.A.5) 207 F.2d 517; Interstate Commerce Commission v. Tank Car Oil Corp. (C.A.5) 151 F.2d 834; Interstate Commerce Commission v. Clayton (C.A.10) 127 F.2d 967. In other cases the Courts sustained the application of the test by the Commission. Scott v. Interstate Commerce Commission (C.A. 10) 213 F.2d 300; A. W. Stickle & Co. v. Interstate Commerce Commission (C.A.10) 128 F.2d 155, cert. denied, 317 U.S. 650, 63 S.Ct. 46, 87 L.Ed. 523; Interstate Commerce Commission v. Asphalt Supply Co. (N.D.Tex.) 152 F.Supp. 559. Against this background the Commission invited the attention of Congress to the increasing employment of diverse schemes to circumvent the existing statutes. Subsequently, in 1957 as part of legislation redefining contract carriage Congress enacted Section 1(2) of Public Law 85–163, 71 Stat. 411, adding a new subsection to section 203 of the Act,[9] providing:

"Except as provided in section 302(c) of this title, subsection (b) of this section, in the exception in subsection (a) (14) of this section, and in the second proviso in section 306(a) (1) of this title, no person shall engage in any for-hire transportation business by motor vehicle,

in interstate or foreign commerce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such person a certificate or a permit issued by the Commission authorizing such transportation."

The added language of this section was not believed to be sufficiently clear, so the following year the Chairman of the Commission again testified before the appropriate Congressional Committees. Hearings on Problems of the Railroads Before the Sub-Committee on Surface Transportation of the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess. 1832 (1958); Hearings on Railroad Problems Before a Sub-Committee of the House Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess. 109 (1958).

Thereafter Section 203(c) of the Act,[10] was amended by the Transportation Act of 1958, 72 Stat. 574, by the addition of the last clause:

"* * * nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person."

## THE DETERMINATION OF THE COMMISSION

After discussing plaintiff's Plan 2 operations, the examiner concluded that plaintiff was neither a common nor a contract carrier.[11] The Commission, how-

---

9. Section 303 of Title 49 U.S.C.A

10. Section 303(c) of Title 49 U.S.C.A.

11. "In determining whether on any state of given facts for-hire or private carrier operations have been or are performed, these definitions have consistently been applied by the Commission according to the primary business of an operator and

the basis upon which he obtains compensation for transportation relating to the primary business. Compare Woitishek Common Carrier Application [42 M.C.C. 193].

"The facts herein clearly establish that respondent's primary business is that of a bona fide wholesale dealer in automobiles selling to other dealers, in no evi-

ever, overruled the examiner's finding on Plan 2, holding:

"We are satisfied, however, that respondent's operations under Plan 2 are in fact for-hire transportation conducted without appropriate authority. See the Automotive Shippers and A A Auto cases, supra. [64 M.C.C. 475 and 77 M.C.C. 365, respectively]. The interstate movement of automobiles by respondent for other dealers not only adds nothing to his primary business as an automobile wholesaler but, rather, in a competitive sense, conflicts therewith. The fact that his activities under Plans 1 and 2 are similar in many respects does not make the latter operation in furtherance of the former; and whether one or the other plan involves the greater or lesser percentage of respondent's total transportation is not controlling. Therefore the two plans must be treated as distinct operations. Compare the Mock case, supra, [86 M.C.C. 529], and cases cited therein.

"Respondent also argues, like Mock, that his Plan 2 transportation is casual and occasional and therefore exempt under Section 203 (b) (9) of the act. However, he admittedly retains the $25 deposit of each driver as compensation for these activities. Furthermore, as noted in the Mock case, this section applies only to a 'person not engaged in transportation by motor vehicle as a regular occupation or business * * *.' Since respondent admittedly engages therein on a regular basis, the exemption cannot apply to such operation. We believe that under Plan 2, respondent has been providing transportation as a for-hire motor carrier without appropriate authority; and we so find.

"Respondent's further contention that he has not held his services out to the general public and consequently may not be classed as a for-hire carrier is without merit. This proceeding was begun to determine whether he was operating unlaw-

dent instance selling to any other part of the general public.

"Slightly different conclusions are warranted concerning that phase of respondent's practices or operations involving the preparation for shipment and the actual shipment of the automobiles purchased by other dealers at Kansas City. As indicated, the services rendered in preparing the vehicles for shipment and the obtaining of drivers, in no respect differ from those which he performs on his own behalf. His only monetary remuneration therefor, is the $25 received from the selected drivers of the automobiles shipped, which some [sic] in such instances serves a dual function as reimbursement to respondent for the cost incurred in preparing the vehicle for shipment and as a personal bond of the driver that due care will be exercised to assure safe delivery of the vehicle in a manner indicated. Since the evidence that the said remuneration does not constitute full compensation for preparing a vehicle for shipment is unrebutted, it cannot reasonably be said that this sum constitutes compensation for transportation arranged for with the driver selected by respondent. Such services are similar to those accessorial services involving the crating and packing of household goods for shipment provided by warehousemen, which services are necessarily preparatory to transportation but do not themselves constitute transportation services. Although respondent believes that good will of the dealers is generated by his practices offsetting any loss which would not be covered by the $25 deposit and possibly ultimately contributing to a profitable future transaction, good will and potential profits in these circumstances are so intangible as not to constitute compensation to respondent for the transportation involved, and insufficient, therefore, to establish any intentional purpose by respondent to profit from the transportation operations as such, even though all the services rendered are preparatory to transportation and respondent holds out his service by advertisement and other means.

"It is concluded, therefore, that the services heretofore and presently offered and performed by respondent are those of a private carrier and consequently have not been and do not constitute transportation for compensation in violation of the Interstate Commerce Act."

fully either as a common or contract carrier, as defined by the act; therefore it is immaterial whether respondent has been serving a single shipper or all shippers of automobiles desiring his service."

## PLAINTIFF'S PROCEDURAL CONTENTIONS AND RULINGS THEREON

Plaintiff contends that he was denied due process of law and his statutory rights because his petition for reconsideration of the Commission's decision was acted upon by the same Division that overruled the examiner's findings with respect to his Plan 2 operations, rather than by the entire eleven-man Commission or a separately constituted "appellate division." Plaintiff further contends that after Division No. 1 of the Commission (consisting of three members) ruled 2–1 that the Plan 2 operations were illegal, plaintiff was entitled to have his petition for reconsideration of this ruling heard by the entire eleven member Commission or at least a majority thereof.

Plaintiff contends that this cause should be remanded to the Commission for hearing on the petition for reconsideration by the full Commission or at least by six members thereof.

The challenged procedure employed by the Commission in this case is based upon Section 17(6) of the Act,[12] which authorized the Commission to:

"* * * make or amend general rules or orders establishing limitations upon the right to apply for rehearing, reargument, or reconsideration of a decision, order, or requirement of the Commission or of a division so as to confine such right to proceedings, or classes of proceedings, involving issues of general transportation importance."

Pursuant to this legislative authority, the Commission in 1961 promulgated

Rule 1.101(a) (3),' General Rules of Practice of the Interstate Commerce Commission,[13] reading as follows:

"*Limitations on petitions for review of division decisions.* Pursuant to authority granted in section 17(6) of the Interstate Commerce Act, the right to apply to the entire Commission for rehearing, reargument, or reconsideration of a decision, order, or requirement of a division of the Commission in any proceeding shall be limited and restricted to those proceedings in which prior to, or at the time of issuance of a division's decision, the entire Commission, on its own motion, determines and announces that an issue of general transportation importance is involved. *In proceedings in which no such announcement has been made, but in which a division reverses, changes, or modifies a prior decision by a hearing officer or where the initial decision is made by a division, a petition to the same division for rehearing, reargument, or reconsideration of its decision will be permitted and will be considered and disposed of by such division in an appellate capacity and with administrative finality.*" (Emphasis added.)

In complaining of the failure of at least a majority of the Commission to act on its petition for reconsideration plaintiff contends that the procedure outlined in the emphasized portion of Rule 1.101(a) (3), supra, does not provide for a disposition of his petition for reconsideration "*by the Commission or an appellate division,*" as contemplated by Section 17(9) of the Act,[14] as follows:

"When an application for rehearing, reargument, or reconsideration of any decision, order, or requirement of a division, an individual Commissioner, or a board with respect to any matter assigned or re-

12. Sec. 17(6) of Title 49 U.S.C.A.

13. Appended to Title 49 U.S.C.A.

14. Section 17(9) of Title 49 U.S.C.A.

ferred to him or it shall have been made and shall have been denied, or after rehearing, reargument, or reconsideration otherwise disposed of, *by the Commission or an appellate division,* a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, *but not otherwise.*" (Emphasis added.)

■ Essentially the same problem was treated from the standpoint of exhaustion of remedies and jurisdiction of the district court in Malone Freight Lines, Inc. v. United States (N.D.Ala.) 204 F. Supp. 745. Though the question was submitted in a different form, that case did rule upon validity of Section 1.101 adversely to the plaintiff's claims.

This Court is in accord with the majority opinion in the Malone case.

Plaintiff's contention that the procedure outlined in Rule 1.101(a) (3) and followed by the Commission in this case violates due process is based upon the claim that an appeal to the very body which made the determination from which the appeal is taken is no appeal at all.

A similar contention was properly denied in A. B. & C. Motor Transportation Co. v. United States (D.Mass.) 151 F. Supp. 367, l. c. 371–372, in which the Court stated:

"The arguments are quite without substance. Motions or petitions for rehearing or reconsideration have time out of mind been addressed without thought of constitutional infirmity to the court or judge which, or who, decided the case in the first instance. We see no reason why applications of the same kind to a Commission cannot be similarly addressed." [15]

■ Moreover, the Commission is a quasi-judicial administrative agency exercising judicial functions in its licensing and enforcement activities. Watson Bros. Transp. Co. v. Jaffa (C.A.8) 143 F.2d 340, l. c. 346; Interstate Commerce Comm. v. Cincinnati, N. O. & T. P. R. Co. (C.C.S.D.Ohio) 64 F. 981, l. c. 982. In the case of a decision by such a body, an appeal, reconsideration, or review is not essential to due process provided due process has been accorded in the original determination. Ohio ex rel. Bryant v. Akron Metrop. Pk. Dist., 281 U.S. 74, l. c. 80–81, 50 S.Ct. 228, 74 L.Ed. 710; Beck v. Missouri Valley Drainage Dist. (C.A.8) 46 F.2d 631, l. c. 637–638, 84 A.L.R. 1089, 42 Am.Jur. Public Administrative Law Sections 137 and 139. In this case due process was accorded the plaintiff in the proceedings in the first instance. Since there is no constitutional right to an appeal to all or a majority of the Commission the claim of deprival of due process cannot be sustained.

### PLAINTIFF'S CONTENTIONS ON THE MERITS

Plaintiff further contends that the Commission's findings should be set aside for the reasons that:

"(1) The Commission's findings and conclusion are not supported by reliable, probative, and substantial evidence; and

"(2) The Commission's order is arbitrary, capricious, and an abuse of its administrative authority."

More specifically, plaintiff argues that his Plan 2 operations constitute "private carriage" in that (1) his activities do not constitute "transportation," as defined in the Act; (2) his activities are not "for compensation"; and, (3) his operations do not constitute a "holding out to the general public."

### SCOPE OF REVIEW

■■ At the outset, it must be noted that this Court's scope of review is limited. A three judge court may not review

---

15. See also the cases collected in 5 C.J.S. Appeal & Error § 1437, pp. 558–559; 5 Am.Jur. 2d Appeal and Error section 978, p. 496 and section 985, pp. 410–11.

the evidence *de novo* but must sustain the findings and conclusions of the Commission where they are found to be supported by substantial evidence. Unless specific and prejudicial departure from the requirements of the law or abuse of discretion is shown, the reviewing court is without authority to intervene and substitute its judgment upon the issue of fact committed to the determination of the Commission. United States v. Pierce Auto Freight Lines, 327 U.S. 515, l. c. 535–536, 66 S.Ct. 687, 90 L.Ed. 821; Rochester Tel. Corp. v. United States, 307 U.S. 125, l. c. 138–140, 59 S.Ct. 754, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, l. c. 286–287, 54 S.Ct. 692, 78 L.Ed. 1260; Interstate Commerce Comm. v. Union Pac. R. Co., 222 U.S. 541, l. c. 547–548, 32 S.Ct. 108, 56 L.Ed. 308.

In defining the function of a court reviewing a decision of the Commission, the Supreme Court in United States v. Pierce Auto Freight Lines, 327 U.S. 515, l. c. 535–536, 66 S.Ct. 687, 697–698, 97 L.Ed. 821, l. c. 835, said:

> "The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

16. Section 303(a) (19) of Title 49 U.S. C.A. This section reads:
"The 'services' and 'transportation' to which this chapter applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or im-

## DISCUSSION OF AUTHORITIES AND PLAINTIFF'S CONTENTIONS ON MERITS

The basis of plaintiff's contention that his activities do not constitute "transportation" is his assertion that he is not a "motor carrier," as that term is defined in Section 203(a) (19) of the Act.[16]

Plaintiff argues that his only connection with his Plan 2 operations is in contacting the individual who drives the car; that the individual executes an "Independent Contractor Agreement" with the owner; and that once an individual assumes control of the car, plaintiff's responsibility thereafter ceases. Therefore, the incidental services plaintiff performs cannot under this set of facts be deemed "transportation."

It is noted that plaintiff makes this argument for the first time before this Court. It is settled law that plaintiff, having failed to raise such an issue in the Commission proceedings, is precluded from raising it for the first time in this review proceeding. United States v. Capital Transit Co., 338 U.S. 286, l. c. 291, 70 S.Ct. 115, 94 L.Ed. 93; United States v. Hancock Truck Lines, 324 U.S. 774, l. c. 778–780, 65 S.Ct. 1003, 89 L.Ed. 1357; Gateway Transp. Co. v. United States (W.D.Wis.) 173 F.Supp. 822. As stated in the Gateway case at p. 828 of 173 F.Supp.:

> "Plaintiffs failed to raise any such issue in their petition for reconsideration by the entire Commission and should not be permitted to do so for the first time in this Court.
>
> "The scope of the judicial review is not to go beyond the issues contained in the petition for reconsideration."

See also United States v. L. A. Tucker Truck Lines, 344 U.S. 33, l. c. 36, 37, 73

plied, together with all facilities and property operated or controlled by any such carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith."

S.Ct. 67, 97 L.Ed. 54, dealing with the effect of failure to object before the Commission to irregularities in the proceedings.

■ Assuming, however, that this issue is properly before this Court, there can be no doubt that plaintiff's activities under Plan 2 constitute transportation within the meaning of the Act. As stated in I. C. C. v. Dudgeon, 213 F.Supp. 710, (S.D.Cal.) 1961, aff'd, C.A.9, Nov. 16, 1962, cert. denied sub nom. Dudgeon v. I. C. C., 372 U.S. 960, 83 S.Ct. 1015, 10 L.Ed.2d 13:

> "There is an active concurrence or privity of contract between the owner of each automobile and the defendant, in the consummation of any one transaction. Although it is made to appear that the owner contracts with the driver for the transportation and delivery of his car, the initial terms and conditions surrounding each movement are prescribed by defendant with each individual owner. The defendant by his holding out, as well as by his verbal representations to each owner, undeniably establishes an expectation on the part of the owner that the defendant assumes to perform a transportation service. The owner accepts the defendant's terms and conditions, turns over to defendant his property and pays the defendant his quoted charge [in this case the driver pays the plaintiff a "quoted charge" of $25 under the name of a "deposit." The driver is reimbursed by the West Coast dealer for this "deposit" and the plaintiff retains the $25. Thus in effect the West Coast dealer pays the plaintiff $25 for each transportation]. The defendant assumes the right, power and duty to perform the service within the scope of his holding out.

> "A driver is necessary to accomplish the terms of defendant's holding out. In order to accomplish this purpose, the drivers are not only selected by the defendant, but must necessarily be under his control during the course of transportation. The drivers receive their instruction from the defendant and they look to the defendant as their employer. * * * In so far as any individual trip is concerned, the driver is an agent or employee of the defendant and his employment during such time is under the supervision and control of the defendant."

Plaintiff next contends that he was not engaged in transportation "for compensation," as required by the definition of contract or common carrier in Sections 203(a) (14) or 203(a) (15).[17] Plaintiff bases this contention on evidence before the Commission which would indicate that plaintiff sustains a loss on each car handled under his Plan 2 operation; that plaintiff provides his Plan 2 service without a purpose or intention of making a profit; and that the $25 charge simply defrays a portion of his expenditures in preparing the automobile for transit. Plaintiff contends that "compensation" is defined as transportation supplied with a purpose to profit from the enterprise and that as plaintiff sustains a loss, he is not subject to the provision of the Act, citing Woitishek Common Carrier Application, 42 M.C.C. 193.

■ Compensation, however, does not necessarily involve the element of profit. "On the contrary it may under some circumstances involve merely reimbursement for expenses of operation." Schenley Distillers Corp. v. United States, (D. Del.) 61 F.Supp. 981, l. c. 988, aff'd, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181. And see Shippers Cooperative Inc. v. I. C. C. (C.A. 9) 308 F.2d 888, l. c. 892; I. C. C. v. Asphalt Supply Co. (N.D.Tex.) 152 F.Supp. 559, l. c. 560; Richard Mock Investigations of Operations, 86 M.C.C. 529, l. c. 534.

■ In any event the test of compensation is not the criterion by which it is to be decided whether plaintiff is in fact,

17. Sections 303(a) (14) or 303(a) (15) of Title 49 U.S.C.A.

as he claims, a private carrier not required to hold a certificate or a permit issued by the Commission authorizing such transportation as he is engaged in. As stated by the Court in Brooks Transp. Co. v. United States (E.D.Va.) 93 F.Supp. 517 at 524:

"Plaintiffs [interveners contesting a Commission determination that Lenoir Chair Company and Schenley Distillers Corporation, petitioners in the original proceedings before the Commission, were engaged in private carriage and therefore not required to secure a permit authorizing their operations] are here attributing to the term 'compensation' a mystical significance which the term does not possess. There are fallacies in this contention even if resort be had, as plaintiffs wish, to mere mechanical logic and a purely analytical interpretation of the terms used in the statutory definitions. Thus, the clause 'when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise' appears (a) in the definition of private carrier, but not (b) in the other two definitions, common carrier and contract carrier. Accordingly, by this same logic, the basic difference between (on the one hand) common carriers and contract carriers and (on the other hand) private carriers, is whether or not the 'transportation is for the purpose of sales, lease, rent or bailment, or in furtherance of any commercial enterprise.' Possibly, this confused thinking of plaintiffs may be due somewhat to the fact that at common law, the common carrier of goods must carry for a compensation. See, Dobie, Bailments and Carriers, 296, 300, 304.

"The history of the Act, we think, completely demolishes the validity of plaintiff's *compensation* criterion and support the Commission's criterion of *Primary business purpose*."

Plaintiff's final contention, that he has not held his services out to the general public and consequently may not be classed as a for-hire carrier is also without merit. On this issue the Commission properly ruled:

"This proceeding was begun to determine whether he was operating unlawfully either as a common or contract carrier, as defined by the act; therefore it is immaterial whether respondent has been serving a single shipper or all shippers of automobiles desiring his service."

## CONCLUSION

In order that transportation be private carriage, it must appear that the transportation is (1) by a bona fide "owner, lessee or bailee" (as used in section 203(a) (17)), (2) who is not a "common carrier" or a "contract carrier" (section 203(a) (17)), and (3) within the scope, and in furtherance, of a primary business enterprise (other than transportation) of the person engaged in the transportation (section 203(c)).

It is clear from the record that the Commission was justified in concluding that the Plan 2 transportation was not private carriage by plaintiff as a bona fide owner, lessee or bailee, within the scope, and in furtherance of the primary business enterprise (other than transportation) of the plaintiff; and that therefore plaintiff was engaged in violation of section 203(c) by conducting a transportation business by motor vehicle in interstate commerce on the public highways without a certificate or permit issued by the Commission authorizing the transportation under Plan 2.

We conclude that there was a rational, factual and legal basis for the Commission's order; that the order is not clearly erroneous, not capricious, arbitrary or the result of any abuse of discretion on the part of the Commission; that there is a substantial basis for the order.

This memorandum opinion shall constitute the Court's findings of fact and conclusions of law.