INTERSTATE COMMERCE COMMISSION, Plaintiff,

v.

AAA CON DRIVERS EXCHANGE, INC., Irving Zola and Helen Zola, and AAA Con Drivers Exchange–L.A.–Inc., Defendants.

United States District Court
S. D. New York.
Oct. 5, 1964.

Seymour Glanzer, New York City, for plaintiff.

Brodsky, Linett & Altman, New York City, for defendants, Alvin Altman, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

This action is brought under § 222(b) of the Interstate Commerce Act, as amended 49 U.S.C. § 322(b), and 49 U.S.C. § 42, to enjoin the two corporate defendants and their officers and agents from engaging in interstate operations on public highways as common carriers by motor vehicle without a certificate of public convenience and necessity issued by the Interstate Commerce Commission, which is required under § 206(a) (1) of the Act, as amended 49 U.S.C. § 306(a) (1).

Defendant AAA Con Drivers Exchange, Inc. has its office and place of business in New York City, and defendant AAA Con Drivers Exchange–L.A.–Inc. carries on the same business in Beverly Hills, California. Defendant Irving Zola is the president and defendant Helen Zola the secretary-treasurer of both corporations, and the two of them are the sole stockholders.

After issue had been joined the Commission moved before me for a preliminary injunction. At the hearing on that motion both sides stipulated that all the evidence either had to offer was before the court, and that the court might render final judgment on the merits on the record then before it.[1]

This case is the latest in a series involving business operations through which owners of automobiles may have their cars driven to distant points in the United States. Thus far those engaged in this business who have come before the court have been held to have "assume[d] in significant measure the characteristic burdens of the transportation business", United States v. Drum, 368 U.S. 370, 375, 82 S.Ct. 408, 411, 7 L.Ed. 2d 360 (1962), and thus to require a

certificate of convenience and necessity under § 206(a) (1) of the Interstate Commerce Act.

The defendants here, referred to as AAA Con, maintain that the operations which they conduct are quite different from those in the prior cases and do not fall within the ambit of § 206(a) (1). In order to assess the validity of their contentions it is necessary that the facts as to their operations be analyzed in detail. There were few conflicts in the evidence adduced at the hearing. The facts as I find them to be are as follows:

The business of AAA Con consists of supplying drivers who wish to travel to distant destinations in the United States by driving someone else's car to automobile owners who wish to have their cars driven to such destinations. In the regular course of this business AAA Con receives inquiry from such automobile owners, usually by telephone. Such inquiries are mostly the result of advertising by AAA Con in the classified telephone directory and in the New York Times, which I will discuss in detail a little later.

When such an inquiry is made, the owner indicates the destination of his car and AAA Con informs him that it will attempt to obtain a driver willing to drive the car to that destination and gives an estimate of what he will have to pay the driver for his services in so doing. If the owner demurs at the amount suggested, there is a discussion of what he is willing to pay and whether a driver is likely to be obtainable at that figure. The amount to be paid to a driver who may be available is fixed at this time.

AAA Con then sends the owner a form letter explaining the details of the service which it offers and encloses two copies of an "Automobile Ownership Authorization," a sample copy of an "In Transit Permit" and a return envelope.

In the form letter AAA Con offers to provide the owner "with a BONDED, LI-

---

1. Since no evidence was adduced specifically relating to AAA Con Drivers Exchange–L.A.–Inc., it will be assumed that its operations are identical to those of AAA Con Drivers Exchange, Inc.

CENSED, and REGISTERED DRIVER who will follow your instructions and deliver your car to any point in the United States." The destination is stated and the amount to be paid directly to the driver by the owner is quoted, part to be paid him at the beginning of the trip and the balance at destination. The amount to be paid to the driver is inclusive of gas, oil and other driver's expenses en route. The owner is specifically told not to pay any money to AAA Con. It is stated that AAA Con's sole function is to find competent drivers, and it specifically disclaims any responsibility for the transportation or delivery of the automobile.

The "Automobile Ownership Authorization Order" has blank spaces for the name, address and telephone number of the owner, the destination of the automobile, its description, the date on which the driver is to be available, and the amount to be paid the driver at the starting point and at destination. The owner authorizes AAA Con to process a driver to drive his car "as per * * * [his] instructions" and gives a guaranty that his vehicle is fully insured. The owner acknowledges his understanding that the driver is not an agent of AAA Con, and that its sole function and responsibility is the screening of drivers and not the transportation or delivery of the automobile. There is a space for the signature of the car owner and a final clause accepting the authorization on behalf of AAA Con with its president Zola's printed signature underneath. If the automobile owner wishes to make such arrangements he fills in this form, signs it and mails one of the two copies back to AAA Con in the return envelope provided.

The "In Transit Permit" sent with the letter is merely a sample form. As will appear the actual "In Transit Permit" used is delivered by the driver when he picks up the car from the owner. The sample "In Transit Permit" is not used.

The "In Transit Permit" is an agreement between the owner and the driver to which AAA Con is not a party. The permit has spaces for the amount of cash received by the driver when he picks up the car, the name, address and telephone number of the car owner and of the person to whom the car is to be delivered, a description of the car, the latest date for delivery, the total amount to be paid to the driver by the owner and the portions to be paid at the beginning and end of the trip. It also has a space for the photograph and thumb prints of the driver and for the signatures of both the owner and the driver. The permit is not signed by AAA Con.

Under the terms of the permit the owner authorizes the driver to deliver the car to the specified destination on his behalf and to make any necessary repairs en route up to $10. Any repairs over that amount are to be made only after notification to the owner and pursuant to his instructions. It provides that in case of any accident or damage to the automobile the owner may retain the unpaid portion of the driver's fee as liquidated damages. The driver agrees to comply with all traffic regulations, to follow the owner's specific instructions, to notify the owner in case of accident or delay, to pay for all gas and oil on the run, not to carry any passengers for hire or to use the car for towing or trucking, and not to carry liquor, narcotics or anything in violation of law. The agreement provides specifically that the driver is not an agent of AAA Con but an independent contractor and a bona fide traveller seeking casual and reciprocal transportation. The driver personally assumes all responsibility for injury to himself or any other person riding in the automobile and for any traffic fines en route.

From the other end AAA Con continuously receives inquiries from persons who are looking for a convenient and inexpensive means of getting to another part of the country. Such persons are bona fide occasional travellers whose principal interest is obtaining a means of transportation for themselves by car to the vicinity of their destination rather than making a profit. They include such persons as students, vacationers and persons with seasonal jobs in other parts of the country such as service personnel

at resorts. Although some of them have availed themselves of the facilities of AAA Con before, usually the shortest period between trips is a year for those who annually go from New York to places like Florida or the West.

When a prospective driver gets in touch with AAA Con, if there is not a vehicle then available to be driven to his desired destination, he is normally told to try again. Unless, due to the time of year, prospective drivers to that area are especially scarce, his name is not listed. A car being available, however, AAA Con, if satisfied with the prospective driver's general appearance, will explain to him that an automobile owner is willing to pay him a given amount to have his car driven to that destination if he is available on the date set by the owner. The prospective driver asks what it will cost him, and he is informed that AAA Con will charge him a fee for putting him in touch with the owner and of the amount of the fee.

If the proposed arrangements are agreeable to the prospective driver, he is given a "Driver's Application for Casual and Reciprocal Transportation." This form has blank spaces for the date, driver's name, his address and telephone number in New York, his permanent address and telephone number, the date he is willing to leave, his description, his driver's license and social security numbers, the name of any union to which he belongs and his membership numbers, whether he wears glasses, where he can be reached at his destination, and the names, addresses and telephone numbers of two relatives and his last employer. In addition there are questions about physical defects and disabilities, whether he has ever been convicted of a crime, is now on parole, has used narcotics or been in a mental institution, is married and has children. His last school and his profession are also to be stated. In the driver's application the prospective driver agrees to pay AAA Con the fee agreed upon. In return for the fee AAA Con undertakes to send the applicant to an automobile owner who is looking for a driver to that destination.

The applicant undertakes to pick up the car himself and deliver it himself to the specified destination without carrying any paying passengers. He certifies that he is a bona fide traveller seeking casual and reciprocal transportation and not an agent or employee of AAA Con whose only function is stated to be "to bring * * * [him], a driver, and a car owner together." He then swears to the application and signs it, and his photograph and thumb prints are affixed.

If AAA Con is satisfied that the applicant is a reliable driver, he then pays AAA Con the fee fixed for obtaining the assignment and is given a "Driver's Conditional Receipt" signed both by himself and by AAA Con. The receipt acknowledges payment of the fee by AAA Con and states the details of the arrangements which he is to make with the owner. It provides that the fee paid to AAA Con is not refundable.

The driver is then informed of the name, address and telephone number of the owner and is told to get in touch with him directly. He receives two copies of an "In Transit Permit" with his photograph and thumb prints affixed, but which are otherwise blank. When the driver arrives at the place where he is to pick up the car from the owner, usually the owner's home, he and the owner discuss the arrangements. If the driver is acceptable to the owner and the assignment to the driver, they fill out the blank spaces in the "In Transit Permit" and sign both copies, one of which is retained by the driver and the other by the owner. The owner pays the driver the first instalment of the amount fixed for the trip. The driver then takes the automobile from the owner's possession, drives it to the destination and is paid the balance owed him by the owner or his representative on delivery.

Neither the owner nor the driver are committed to each other until they have talked together, and either may reject the other. From time to time owners have rejected drivers sent by AAA Con, and drivers have refused to accept a trip after seeing the car and meeting the owner.

If the driver is rejected by the owner or refuses the trip, he will be sent to another owner if one is available, and AAA Con is still satisfied that he is reliable. If he is not sent to another owner, AAA Con returns to him the fee which he has paid it.

AAA Con does not furnish the owner with any insurance on the trip nor does it carry any insurance in his favor. If an owner inquires about insurance, AAA Con will furnish him with an application for trip liability and property insurance. The application is supplied to AAA Con by an insurance company, and AAA Con keeps such blanks on hand for the convenience of its customers. However, an application is not sent to an owner unless he requests it in the first instance. If he does, the blank application is sent him, he fills it out himself, signs it and sends it with the premium directly to the insurance company. AAA Con does not receive any commission or other financial return on policies thus taken out by owners.

AAA Con does not maintain any overall list of drivers. Apart from repeat and word of mouth business, it relies on advertisements to obtain both drivers and interested owners. Its advertisements in the classified telephone directory appear under the headings "Automobile and Truck Transporting" and "Drive-away Companies." However, as long ago as 1959 AAA Con requested that its advertising in the telephone directory be listed under the heading "Driver's Exchange" instead of those under which it is carried. But this request was refused by the telephone directory publisher because there was no such heading in the directory.

AAA Con uses several different tradenames in advertisements under these headings. The advertisements state that there are "Drivers Available" who will provide "door to door service," and who are said to be bonded, certified and registered. They contain the statement "Service Guaranteed and Assured." The only so-called "bond" is the driver's application to AAA Con plus the payment of AAA Con's driver's fee. The certification consists of checking the driver's license and social security card against the numbers he puts down on his application plus the statements under oath which he makes in it.

There is no fixed schedule of rates either for the payments made by the owners to the drivers or for the fees charged the drivers by AAA Con. The number of drivers available for particular destinations varies widely, dependent on the season. For example, during the early summer there are many drivers who wish to go to points in the West. In the late fall and early winter there are many who wish to go to Florida. The estimate given by AAA Con to the owner at any given season is largely dependent on the supply of drivers available. While the amount to be paid the drivers is set by the owner, it is fixed with the advice of AAA Con as to the chances of obtaining a driver for the trip at that figure. The fees charged to the drivers by AAA Con also vary in accordance with the supply of trips to the desired destination then available and the supply of drivers to make such trips. Neither the amounts paid to the drivers by the owners nor the fees paid by the drivers to AAA Con are based primarily on the distances involved. The controlling factor is the seasonal supply and demand. In many instances rates and fees are greater on shorter trips than on longer trips. Owners' payments to drivers and drivers' fees to AAA Con bear no fixed relationship to one another. Depending on the seasonal conditions and the supply and demand, a driver may make a profit out of the trip, may break even or may have to spend some of his own money.

This is the pattern of the usual and customary operations carried on by AAA Con in all but a bare minimum of the transactions which it handles. The conditions and procedures stated in the forms which it uses are followed as faithfully as can be expected in a business having some 1200 separate transactions a year, and the relationships established by the forms appear to be consistently maintained. Operations have been openly conducted in this manner since 1959.

The Commission, however, lays stress on two instances in which this pattern of operation was not followed as demonstrating that AAA Con was in fact operating on quite a different basis.

The first of these instances relates to the automobile of Mrs. Valerie Gorsuch, which was stolen by the driver selected by AAA Con while it was being driven to destination and never recovered. It is noteworthy that this is the only instance of any irregularity to which the Government was able to point in the course of transactions carried on by AAA Con over a period of several years at the rate of some 1200 a year. The only deviation from the usual pattern of operations in this case was that the Gorsuch car was picked up by another driver, delivered to an independent garage in New York from which it was picked up by the driver who was to take it to destination. This single instance, far from establishing significant deviations from the regular pattern of operations, emphasizes how consistently they conform to pattern.

The driver who picked the Gorsuch car up was one de Almeida, who from time to time undertook specific off hour driving jobs at AAA Con's request though he had a full time job elsewhere. De Almeida's activities are the second instance which the Government claims indicates substantial deviation from the professed pattern of operation. Over a period of several years de Almeida on 10 or 15 occasions drove cars for owners under arrangements made by AAA Con for which he was paid by the owners. Some of them were chauffeuring jobs for a few hours for which de Almeida was paid and for which he in turn paid AAA Con a small commission. The others involved the pick-up of cars from owners in the vicinity of New York City when the driver who was to take the car to its ultimate destination was unable to do so and the delivery of such cars to one or another independent garage where they were in turn picked up by the drivers who were to drive them to destination. The garage fees were paid by the driver or the owner, as was de Almeida's charge for driving the car to the garage. In no case was de Almeida used as the ultimate driver to destination.

These variations from ordinary operating procedures are in themselves so inconsequential as to be of no significance. Moreover, in view of the very small number of instances in which they occurred, they do not in any event affect the basic picture presented. This is especialy true in light of the five year period that the Commission has had to investigate the operations openly carried out by AAA Con and the investigations which it conducted.

Thus what AAA Con does is to bring together drivers and owners and supply the papers and procedures by which the owner and driver can reach their own agreement. Its sole return for so doing is the fee which it charges to drivers for putting them in touch with owners who wish to have their cars taken to the places where the drivers want to go. AAA Con neither transports nor delivers the car itself. Nor does it assume any responsibility whatsoever for such transportation or delivery. In fact it has been meticulous in avoiding any assumption of such responsibility, or, indeed, any appearance of so doing.

It is the position of the Government that on the facts shown by this record AAA Con is required to obtain a certificate of convenience and necessity from the Commission as an interstate common carrier under § 206(a) (1) of the Interstate Commerce Act, as amended 49 U.S.C. § 306(a) (1). Insofar as pertinent here that section provides that "no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operations on any public highway * * * unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: * * *."

Section 203(a) (14) of the act defines a common carrier by motor vehicle as "any person which holds itself out to the general public to engage in the trans-

portation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes * * *."

Both the Commission and the defendants agree that the test to determine whether AAA Con is a common carrier by motor vehicle is that stated by the Supreme Court in United States v. Drum, 368 U.S. 370, 375, 82 S.Ct. 408, 411, 7 L.Ed.2d 360 (1962), to which reference has already been made—whether AAA Con has "assume[d] in significant measure the characteristic burdens of the transportation business."

■ In my view AAA Con, by conducting its business in the manner it does, cannot be said to have assumed the characteristic burdens of the transportation business in any significant measure. It advertises for interested drivers and owners, makes a preliminary investigation of the driver applicants and then sends the driver to the owner for a fee paid to it by the driver. Once that is done, the responsibility of AAA Con in the matter ends both legally and factually. The owner makes the ultimate decision whether to accept the driver and the driver whether to accept the trip. The owner chooses the destination, the time of departure and arrival and gives all instructions as to the route to be used. AAA Con takes no part in any of these arrangements. In case further instructions are necessary because of accident or other unexpected event, it is the owner to whom the driver reports. The driver is specifically told to report directly to the owner and not to AAA Con. The owner provides the vehicle, which never comes into the possession or control of AAA Con and, indeed, in most cases AAA Con does not even see it. The inspection and maintenance of the vehicle is the responsibility of the owner and the driver. If anyone other than the driver is to travel with him, the owner's permission must be obtained. All financial risks of the trip are also on the owner, for it is he that must bear the losses in case of accident, theft or mechanical failure. AAA Con

assumes no legal responsibility in such situations, and any insurance to protect the owner or driver against them must be taken out and paid for by the owner without any participation by or financial return to AAA Con.

This relationship is not dissimilar to that of an employment agency or of a real estate broker bringing buyer and seller together. It is true that the investigation of the responsibility of drivers would be one of the burdens of a person engaged in the interstate transportation business. It is also true that the blank forms supplied by AAA Con contain the basic terms of the agreement eventually entered into by the driver and owner respectively, and thus bear some resemblance to forms which a person engaged in the interstate transportation business would have available for his own use in interstate transportation transactions. However, these may be said to be incidentals rather than characteristic burdens of interstate transportation business. AAA Con has not assumed characteristic burdens of such business in significant measure because it carries on these activities. It is not engaged in the transportation business merely because it does one or two things which are incidents of that business and, indeed, of many others.

Moreover, this conclusion is fortified by reference to two other provisions of the Interstate Commerce Act on whose meaning the parties are not in disagreement. Section 203(b) (9), 49 U.S.C. § 303(b) (9), exempts from certification by the Commission "the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business." Section 211(a), 49 U.S.C. § 311(a), provides that "[n]o person shall for compensation sell or offer for sale transportation subject to this chapter or shall make any contract, agreement or arrangement to provide, procure, furnish, or arrange for such transportation or shall hold himself or

itself out by advertisement, solicitation, or otherwise as one who sells, provides, procures, contracts, or arranges for such transportation, unless such person holds a broker's license issued by the Commission to engage in such transactions * * *."

The Government has conceded on the record here that if AAA Con is merely acting as a broker of casual occasional transportation as defined in § 203(b) (9) of the act, it is not required to obtain a certificate of public convenience and necessity for its operations under § 206 (a) (1).[2] See Automotive Shippers, Inc., 64 M.C.C. 475, 481 (1955).

The record clearly establishes that drivers who come to AAA Con looking for automobiles that they can drive are bona fide travellers engaged only in casual, occasional transportation. The primary object of these drivers is to get to their destinations as inexpensively as possible rather than to make a profit for themselves. Indeed, it is difficult to conclude that there is likely to be a money profit for a driver on most long trips considering the gas and oil which he must pay for and his food and lodging en route. The drivers, while benefiting themselves, have a service to offer car owners who wish to get their cars to a distant point with a minimum of expense and trouble. AAA Con limits itself to bringing together such drivers and such owners. It does not purport to serve as a principal in any phase of the transaction between them. Its role is completed once the two actual principals are brought together. Its fee is charged for acting as a middleman between the two, but that fee is not based on any profit which the driver may make from the trip. In sum, the activities of AAA Con in bringing together owner and driver are likely to be less extensive than those of the real estate broker bringing together buyer and seller. Even the papers which AAA Con supplies are not really as voluminous as those which would be supplied by a real estate broker in many instances.

The Commission suggests that a 1958 proceeding before it involving AAA Con, in which the business which it then conducted was held to require a certificate, is controlling here or at least should be given considerable weight. AA Auto Delivery, Inc., 70 M.C.C. 365 (1958). But the facts in that case were quite different from those in the case at bar. There it was quite plain that AA Auto Delivery was engaged in a typical driveaway operation in which it assumed responsibility for the transportation and delivery of automobiles to destination. In that case the Commission, quoting from Automotive Shippers, Inc., supra, said, at p. 372:

"Assuming, improbable as it seems, that all drivers whose services are arranged for by applicant are bona fide travellers, who are not engaged in transportation as a regular business do not receive any compensation other than the use of the car, and do not carry passengers for hire, then applicant's operation would appear to require no authority from this Commission."

The improbability referred to by the Commission in fact has come to pass. For, as a result of the decision against it in 1958, AAA Con has so substantially altered its operations and procedures and, indeed, the responsibility which it assumes in its business transactions that it now for all practical purposes falls within the narrow exception carved out by the Commission itself. It had a legitimate right so to alter its method of doing business as to fall within the exception suggested by the Commission and the fact that it has accepted the Commission's own suggestion should not place it in a worse position than a newcomer conducting identical operations.

The Commission's reliance on ICC v. Interstate Auto Shippers, Inc., 214 F.

---

2. The Government also conceded that under such circumstances AAA Con is exempt from obtaining a license as a broker under § 211(a), though this question is not before the court here.

Supp. 473 (S.D.N.Y.), aff'd per curiam, 323 F.2d 367 (2 Cir. 1963), is misplaced, and that case is not controlling here. The facts there are markedly different from those in the case at bar and impelled quite a different conclusion from that which I reach here. There Interstate was expressly authorized to act as agent of the automobile owners in selecting drivers and the agreement for transportation and delivery was made between the owners and Interstate. Interstate through its own "dispatcher" instructed the drivers as to the routes that they were to take and in case of accident or major service needs the drivers notified Interstate rather than the owners and Interstate gave them further instructions. The owner paid Interstate for the services performed, and Interstate agreed to reimburse the owner up to $50 in case of accident. In many cases the owner never even met the driver, and the fees paid by the owner bore a direct relation to the distance to be travelled. These and other differences between the two cases are quite sufficient to show that the Interstate case involved a typical driveaway operation in which Interstate assumed in significant measure the burden and responsibility of transporting the cars of owners from one point to another in interstate commerce.

There are numerous other cases dealing with such driveaway operations but in each of them the facts were as substantially different from those in the case at bar as they were in the Interstate case, if not more so. See ICC v. Teeter, 228 F.Supp. 479 (N.D.Ga.1964); Studna v. United States, 225 F.Supp. 973 (W.D. Mo.1964); Orleman v. United States, 219 F.Supp. 945 (E.D.Mich.1963); ICC v. Dudgeon, 213 F.Supp. 710 (S.D.Cal. 1963), cert. den., 372 U.S. 960 (1963); United States v. Aides, Inc., 211 F.Supp. 122 (E.D.Pa.1962); Service Associates, Inc., 89 M.C.C. 33 (1962); Fred D. Spencer, 88 M.C.C. 243 (1961); Richard Mock, 86 M.C.C. 531 (1961); Automotive Shippers, Inc., supra; Walter V. Lord, 34 M.C.C. 549 (1942); Kenosha Auto Transport Corp., 24 M.C.C. 753 (1940); Howard Sober, Inc., 23 M.C.C.

80 (1940); John P. Fleming, 8 M.C.C. 469 (1938), modified sub nom., Alton R. R. v. United States, 36 F.Supp. 898 (E.D.Mich.1941), aff'd, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942); D. L. Wartena, Inc., 4 M.C.C. 619 (1938). In the line of cases dealing with this subject matter the facts here are unique and this case must stand on its own bottom.

On the record before me I conclude that the defendants are not interstate common carriers required to obtain a certificate of convenience and necessity under § 206 (a) (1) of the Interstate Commerce Act.

The complaint of the Commission seeking injunctive relief against the continuance of the AAA Con business without such a certificate is therefore without merit and must be dismissed. Judgment will be entered accordingly.

This opinion will constitute my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

It is so ordered.